ANDERSON v. KISSAM et al.

(*Circuit Court, S. D. New York.* August 11, 1888.)

1. BANKS AND BANKING—CASHIER—CHECKS FOR INDIVIDUAL ACCOUNT—LIABILITY OF PAYEE.

The cashier of a bank kept an account with the defendants, who were brokers and bought and sold stocks for him, and from time to time the defendants received checks of his bank upon another bank, its correspondent, drawn by him in his official capacity, and collected them from the bank upon which they were drawn, and applied the avails to the cashier's individual account. In an action brought by a receiver of the bank of the cashier to recover of defendants the amount of the checks received by them, *held:* (a) The checks being made payable to the order of the defendants for the cashier's individual use, the defendants took them under an obligation to ascertain at their peril that the cashier had authority outside of his ordinary official authority to make the checks, and could not assume that he was acting within the scope of his official duties. A purchaser of commercial paper made by an agent cannot acquire any title to it as against the principal, unless he can show that it was made by the agent upon due authorization; and when he knows that the agent has made it in the name of the principal for his own use, he must be prepared to show that special authority in that behalf was delegated by the principal, and cannot rely upon the implied or ostensible authority of the agent to make such paper in the ordinary business of the principal.

2. SAME—TROVER.

(b) It having been shown that the cashier had no authority to make the checks, and that the checks were paid by the bank upon which they were drawn, the defendants were *prima facie* liable in action of trover for the face amount of the checks.

3. SAME—FUNDS DEPOSITED CLANDESTINELY TO BANK'S CREDIT.

(c) The circumstance that the cashier clandestinely deposited funds with the bank upon which the checks were drawn to the credit of his own bank, which deposits were credited to his own bank, is not competent in mitigation of damages. When credited to the cashier's bank. the deposits became the property of that bank as against the cashier and the defendants. The case for the plaintiff was complete when it appeared that the checks had been paid by the bank upon which they were drawn out of funds standing to the credit

of the cashier's bank; the plaintiff was then entitled to recover the full amount; and it was then incumbent upon the defendants, if they sought to reduce the damages, to show that notwithstanding the wrongful conversion of the paper the cashier's bank did not suffer loss.

4. SAME.

(d) The fact that some of the moneys thus clandestinely deposited by the cashier were paid in by the defendants at his request does not affect the defendants' liability, or go in mitigation of damages.

5. SAME—CUSTOM AND USAGE.

(e) Evidence of a usage that bankers and brokers regard payments made by means of such checks as ordinary payments of cash made by individuals for their own account is not admissible.

At Law. On motion for new trial.

Action by Anderson, as receiver of the First National Bank of Albion, against Kissam and others, to recover moneys alleged to have been misappropriated by defendants. There was a judgment for plaintiff, and defendants move for a new trial.

*George W. Wingate,* for plaintiff.

*John E. Burrill* and *Elisha Root,* for defendants.

WALLACE, J. This action is in substance one of trover to recover moneys of the First National Bank of Albion, alleged to have been wrongfully appropriated by the defendants during the years 1880 and 1881. The case was tried with a jury, and the jury found a verdict for the plaintiff for $103,000 principal, with $44,759 interest. The case is now here upon a motion by the defendants for a new trial.

It appeared by the evidence that in 1880 one Warner was the cashier of the Albion bank, and for some time had been intrusted with the almost exclusive management of its affairs. In November, 1881, he became its president. In August, 1884, the bank failed, Warner absconded, and the plaintiff, who was appointed its receiver, took possession of the assets. An examination of its affairs showed that Warner had misappropriated moneys and securities of the bank to the amount of over $300,-000, and was otherwise indebted to the bank in a considerable sum. It was further shown that Warner had been carrying on stock speculations through the agency of the defendants, who were stock-brokers and bankers of New York city; that he opened a customer's account with them May 11, 1880, and continued to buy and sell stocks and securities upon margins through them, and to deposit with and draw upon them as bankers, during that year and the next; and that from time to time the defendants received large sums of money from him by checks of the Albion bank payable to their order, drawn by Warner, as cashier, upon the Third National Bank of New York city. The defendants collected these checks, and placed the proceeds to Warner's credit in his account with them. It was also proved that for many years the Albion bank had kept a banking account with the Third National Bank of New York, and had been accustomed to draw upon it at sight, and send it collections and remittances; that after Warner became the cashier of the Albion bank he took personal charge of the correspondence between that bank and the New York bank, and intercepted the letters of advice and monthly statements sent by the

New York bank to the Albion bank, and adopted other methods to conceal from the other persons associated with him in conducting the Albion bank the true state of the account between the two banks; that from time to time he deposited with the New York bank, in the name of the Albion bank, funds in his possession, and from time to time drew checks and drafts in the name of the Albion bank, as cashier, upon the New York bank, for his own transactions and speculations; and that the checks and drafts thus drawn by Warner for his own use were not credited to the New York bank on the books of the Albion bank, nor were the deposits made in the name of the Albion bank by Warner personally charged to the New York bank on the books of the Albion bank, although they were credited to the Albion bank by the New York bank; and neither the checks nor drafts nor the credit items appeared in any way upon the books of the Albion bank. The evidence was sufficient to justify the jury in finding that Warner used the account of the Albion bank with the New York bank as the means of appropriating, without the knowledge of the directors or other officers of the Albion bank, and clandestinely, the funds and credit of that bank for his own benefit. It appeared by the books of the two banks that the checks and drafts upon the New York bank, and charged to the Albion bank, but not credited by the Albion bank to the New York bank, during the period of Warner's defalcations, amounted to $267,000, and the deposits credited by the New York bank to the Albion bank, but not charged by the Albion bank to the New York bank, during the same period, amounted to $281,-000. The checks received by the defendants between May 11, 1880, and August 26, 1881, and including those dates, aggregated the amount of $103,000. During the same period they received from Warner from other sources $107,703. The defendants bought and sold stock for Warner on a margin of 10 per cent., and many of the checks in question were received by them pursuant to their request to remit for margins. The first and last checks were for $10,000 each; one was for $15,000. In January, 1881, they received checks for margins aggregating the sum of $50,000. Testimony was given for the plaintiff tending to show that Warner was rated, where he resided, as worth from $15,000 to $20,000; and testimony was given for the defendants tending to show that they supposed that other persons were interested with Warner in his stock transactions, and did not suspect that he was using the funds of the bank illegitimately. It also appeared that from time to time Warner drew on the defendants, and that during the period covered by the checks in controversy they paid on his drafts, into the Third National Bank, to the credit of the Albion bank, at various times, sums aggregating $89,202, and that this amount was credited to the Albion bank on the books of the New York bank, and $25,850 thereof was charged on the books of the Albion bank to the New York bank, but the rest did not appear in the books of the Albion bank.

Upon the trial, the court excluded the testimony offered by the defendants to show that it was customary with bankers and brokers of New York city to receive cashiers' checks and drafts drawn in favor of

their own banks upon New York banks as cash, upon transactions with the cashier individually. At the close of the testimony, the defendants requested the court to instruct the jury to find a verdict for the defendants. Defendants also requested the court to instruct the jury that the defendants were not liable for any sum in excess of the difference between the sums received by them from Warner upon the checks of the Albion bank and the sums paid by them on Warner's drafts to the New York bank to the credit of the Albion bank. The court refused such instructions. The court instructed the jury, in substance, that it was incumbent upon the plaintiff to establish that the moneys represented by the checks received by the defendants were moneys of the bank which had been misappropriated by Warner; and that, when the defendants received the checks, they took them with guilty knowledge that Warner in using them was misappropriating the funds of the bank; and that, unless they found both these propositions established by the evidence, their verdict should be for the defendants. They were further instructed that they might find upon the evidence that Warner was permitted by the directors of the bank to draw such checks for his own use, or to use the money of the bank for his own purposes, or they might find that the directors of the bank were in collusion with Warner, and cognizant of his transactions; that if they found that those who represented the stockholders of the bank as its directors or managers permitted Warner to draw such checks, or use the moneys of the bank for his own purposes, not as co-conspirators or collusively, but trusting in his integrity, or believing that the bank would not be injured, or through loose management on their part, the plaintiff could not recover; but if they did this collusively their consent could not shelter the defendants, because they had no power by virtue of their position to consent to a fraud upon the stockholders. The jury were further instructed that upon the issue whether the defendants received the checks with guilty knowledge the question was not whether they were negligent in receiving them, or in allowing Warner to deal with them as they did, but the question was whether they were guilty of bad faith; that defendants were bound to know that a cashier has no authority as such to loan the money of the bank, or use its checks, for his personal use; that the jury were to infer that the defendants knew this when they received the checks, and therefore the question was whether the defendants believed that by some special arrangement or confidence Warner was permitted by those who were associated with him in the management of the bank to use its checks and moneys as he did; and if the jury found that the defendants so believed, the defendants were not guilty of *mala fides*. The defendants insist upon this motion that the court erred in excluding the testimony of custom, in refusing to instruct the jury as requested, in the instructions given to the jury, and urge other grounds for a new trial.

In some aspects this is a hard case for the defendants. If the verdict stands, they are made responsible to pay over a very large sum of money which came to their hands to be invested and handled for another person in consideration of a small commission to be received by them, and

which they have paid back to the person from whom they received it; and there is no reason to suppose that they had any active or defined purpose when they received the money, or at any time, of assisting the person from whom they received it to defraud others, or to injure others in any way. It is altogether likely that they could have shown, if they had been permitted to do so, by the testimony of any number of respectable bankers and brokers, that it is every day practice in Wall street for those in their line of business to buy and sell stocks for bank presidents and cashiers who are speculating there, and to accept drafts and negotiable paper of the corporations of these officers, made by them officially, in payment of the margins or purchase money, and that such transactions are so frequent and common in Wall street that they do not attract special notice, and do not usually excite a passing suspicion that they are irregular or improper. But no usage, however common and well recognized, can be invoked to justify a banker, or any one else, in taking money or negotiable paper in payment of an agent's debt, known to belong to his principal, or known to belong to a trust-estate, to satisfy the trustee's personal debt, or to shield the banker from accountability, who willfully closes his eyes and stops his ears to facts and circumstances which import notice that the agent or trustee is misappropriating the money or property intrusted to him. Therefore, if there is any significance in the fact that a bank president or cashier offers negotiable paper of his corporation, made by him in his official character, in payment of his personal debt, or to raise money for his personal use, it matters not that bankers generally do not appreciate it. If they regard the transaction as equivalent to one in which the individual comes with money in hand, they ignore its real character, because in that case he comes with what purports to be his own, having the possession which implies title and ownership, and the right to use it as he sees fit. When he comes with money obligation of a corporation, which is the contract of a corporation only because he has made it, and which is not its contract if he has made it without authority, the transaction is a very different one. Every person who takes such an obligation must ascertain at his peril that the agent who has made it was authorized to do so; and the moment that it appears that the contract has been made for the agent's own use and benefit, that moment his authority is impugned and impeached. No principle of the law of agency is better settled than that no person can act as the agent for another in making a contract for himself. Therefore it is that a bank president or cashier has no implied authority to bind his corporation to negotiable paper made for his own use; and if it appears upon the face of the paper that it is payable to the individual who has made it in an official capacity, the obligation is nugatory, and no purchaser can enforce it.

Upon this principle it was held in *Claflin* v. *Bank*, 25 N. Y. 293, that a general authority to the president of a bank to certify checks drawn upon it, does not extend to checks drawn by himself; and if the face of the check shows the president's attempt to use his official character for his private benefit, every one to whom it comes is put upon inquiry,

and if the certificate is false no one can recover against the bank as a *bona fide* holder. So, too, it was held in *Bank* v. *Bank*, 95 U. S. 557, where a bank cashier made his individual note payable to the order of his bank,· and indorsed it officially, that a purchaser of the note was charged with notice that the indorsement was not within the implied authority of the cashier, and must prove actual authority in order to recover of the bank as indorser. It can make no difference whether the agent or officer appears to be the party to whom the paper is payable upon the face of the instrument, or whether it appears by extrinsic facts that he is the real party for whose benefit it was made; consequently, whenever he offers the instrument under· circumstances which show that he has made it officially for his private use, the party dealing with him must take notice of his want of authority, and cannot treat it as the obligation of the principal, unless he can prove the existence of some special and extraordinary authority on the part of the agent. For these reasons the testimony offered by the defendants to show that cashiers' checks, when used in the private transactions of bank cashiers, are by usage regarded as cash, was properly excluded. If the tendency of the testimony·was to establish a usage·to the effect that such payments are regarded by bankers as ordinary payments of cash made by individuals for their own account, the usage would contravene well-settled legal principles. In any other aspect the testimony was immaterial.

The views thus expressed are pertinent in considering whether the instructions given to the jury were correct respecting the title acquired by the defendants to the checks and the moneys the checks represented. If the instructions did not accurately present to the jury the legal principles by which, upon the evidence, the rights of the parties were to be determined they certainly did no injustice to the defendants. The case was put to the jury upon the theory that the defendants, in taking the checks, occupied the position of purchasers of commercial paper, and as though their liability was to be tested by the rule applicable to actions for the· wrongful conversion of such paper. If they acquired title to the checks as against the bank, of course they acquired title to the proceeds, and, if they were *bona fide* purchasers, their title was perfect; otherwise they became liable for the proceeds as for a conversion. *Comstock* v. *Hier*, 73 N. Y. 269. The defendants were given the full benefit of the distinction between negligence and *mala fides* in the purchase of ·negotiable paper, and the jury were instructed that mere suspicion on the part of the defendants was not sufficient to charge them with notice that Warner was using the checks without authority. The doctrine of *Goodman* v. *Simonds*, 20 How. 343, was adopted as applicable to the facts. The facts in evidence certainly justified the submission of the question to the jury whether the defendants did not have notice that Warner was availing himself of fiduciary powers to use the funds of the corporation for unauthorized purposes. As the checks were made payable to the order of the defendants for Warner's individual use, in legal effect they were made payable to Warner's own order. The defendants knew that he was not acting within the scope of any ordinary agency when he made

checks officially for use in his private transactions. The authority of a cashier to represent the bank does not extend to a contract involving the payment of money not loaned by the bank in the ordinary way. *Bank* v. *Dunn*, 6 Pet. 51; *U. S.* v. *Bank*, 21 How. 356; *Bank* v. *Bank*, 10 Wall. 604. As the executive officer of the bank, he transacts its business under the orders and supervision of the board of directors. Authority to use its credit, or transfer its funds for his private use, cannot be implied from the fact that his official position puts it within his power to act dishonestly in this behalf. Although the defendants were bound to know when they took the checks that the paper could not be treated as the paper of the bank unless the managers of the bank had loaned him the money represented by it, there was evidence which, unexplained, tended to show that such a loan had been in fact made. The evidence consisted in the circumstances that the checks were drawn upon the regular correspondent of the bank, were drawn frequently, were for large amounts, and the transactions extended over a considerable period of time. These circumstances indicated the improbability that the cashier was acting clandestinely or criminally, and suggested that he was acting with the acquiescence of the directors or that the directors were grossly inattentive to their duties. If the circumstances were sufficiently notorious and peremptory to preclude any other theory than that the directors were aware of what was being done, and were not such as to imply that the directors were willfully ignoring their duties, and acting collusively with Warner, they would afford sufficient evidence of Warner's authority to use the funds of the bank as he did, and would have justified the defendants in relying upon the ostensible authority evinced by the acquiescence and recognition of the directors. As was said by the court in *Martin* v. *Webb*, 110 U. S. 14, 3 Sup. Ct. Rep. 428:

"It is clear that a banking corporation may be represented by its cashier— at least where its charter does not otherwise provide—in transactions outside of his ordinary duties without his authority to do so being in writing, or appearing upon the record of the proceedings of the directors. His authority may be by parol and collected from circumstances. It may be inferred from the general manner in which, for a period sufficiently long to establish a settled course of business, he has been allowed without interference to conduct the affairs of the bank. It may be implied from the conduct or acquiescence of the corporation, as represented by the board of directors. When, during a series of years, or in numerous business transactions, he has been permitted, without objection, and in his official capacity, to pursue a particular course of conduct, it may be presumed, as between the bank and those who in good faith deal with it upon the basis of his authority to represent the corporation, that he has acted in conformity with instructions received from those who have the right to control its operations. Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. * * * That which they ought by proper diligence to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business."

The defendants could rightfully assume that the directors of the Albion bank did use reasonable diligence in acquainting themselves with the state of its account with its principal agent, the New York bank, and did exercise proper control and supervision generally in the management of its affairs; and the fact that Warner was nevertheless able to use the funds of the bank in such large amounts, for so long a period of time, and through the medium of the regular correspondent of the bank, was inexplicable, except upon the theory of the acquiescence of the directors, or of their guilty complicity with him, or of the existence of an extraordinary laxity on their part in the conduct of the affairs of the bank. The defendants, however, chose to rely upon appearances, instead of seeking authentic information. They were not certain, and could not be from the nature of the case, whether, notwithstanding appearances, the directors were not being deceived by Warner, and were not in fact ignorant that he had ever made any of the checks in question. It was incumbent upon the defendants to show that the directors knew and acquiesced in what was being done by Warner, before they could rely upon his official signature. The evidence raised a presumption of such knowledge and acquiescence on the part of the directors, but did not show it conclusively. It presented a question of fact for the consideration of the jury; and the jury found, as the evidence fully warranted them in doing, that the directors were ignorant of Warner's acts. As is stated in Wharton on Agency, (section 139:) "The pretension by an agent to extraordinary or peculiar powers is by itself sufficient to arouse suspicion." When the transaction is such as should arouse suspicion of the agent's authority to represent his principal, it is the duty of those who deal with him in a representative character to apply to his principal for information. The defendants did not choose to take the safer course; they preferred to rely upon the evidence of Warner's authority evinced by the facts and circumstances which tended to show that the directors must have known of and consented to his use of the funds of the bank. The jury found not only that the directors did not know this, but also found that the defendants did not believe, when they took the checks, that Warner was authorized to make them by his co-managers of the bank. The doctrine that a purchaser of negotiable paper acquires a good title if he acquires it for value, and honestly, notwithstanding he may have been grossly negligent in failing to make proper inquiries, has no application to a case like the present. A purchaser of commercial paper, made by an agent, cannot acquire any title to it as against the principal, unless he is able to show that it is the paper of the principal, made by the agent by due authorization. When he has information that the agent who has made the paper has made it in the name of the principal, for his own use, he must be prepared to show that special authority in that behalf has been delegated by the principal, and cannot rely upon the implied authority of the agent to make such paper in the ordinary business of the principal. In accordance with these views, the defendants were not entitled to the instruction that they were only liable if the jury found they took the checks with guilty knowledge that Warner had no

authority to use them; and it would have been proper to instruct the jury that the plaintiff was entitled to a verdict if they found that Warner had no authority, actual or ostensible, to use them.

It is insisted for the defendants that, inasmuch as the checks were paid by the New York bank out of funds in part contributed by Warner himself, the Albion bank was not a loser of the face amount of the checks, and the plaintiff ought not to recover beyond the extent that the checks were paid out of the moneys of the Albion bank. The evidence did not indicate that the New York bank had any notice that the checks were not put out by Warner in the course of the ordinary business of the bank; consequently, when they were presented to and collected of the New York bank, the latter became a *bona fide* holder for value, and the Albion bank became liable to it for the face amount of the checks. Several of the adjudications which decide that the maker of commercial paper can maintain an action for conversion against the person who, with notice that it has been put fraudulently into circulation, negotiates it to a *bona fide* holder for value, also decide that he can recover the amount of the paper without averring or proving that he has paid it to the holder, and that it is enough, *prima facie*, that he has become liable to pay it, to entitle him to recover the face amount. *Decker* v. *Mathews*, 12 N. Y. 313; *Evans* v. *Kymer*, 1 Barn. & Adol. 528; *Paine* v. *Pritchard*, 2 Car. & P. 558. It has been held that the defendant may prove the insolvency of the maker, and thereby lessen the damages; but, in the absence of evidence of any want of ability of the maker to pay, the presumption is that he is able to pay the paper, and will be obliged to do so. *Potter* v. *Bank*, 28 N. Y. 641. It is enough for him to show that he has incurred a liability to pay the amount by the wrongful act of the defendant; but, if the facts are such that this liability will not result in actual loss, he will only be entitled to recover nominal damages. The law presumes that loss will follow liability; consequently, it is for the defendant to overcome the presumption by evidence which will take the case out of the ordinary category.

A check is not only a bill of exchange, upon which an action can be maintained against the drawer by the drawee who has paid it, but is a bill which is presumed to be drawn on actual funds, and appropriates the funds to the drawee upon payment. Undoubtedly, in an action for the wrongful conversion of such paper, if the defendant proves that payment of the check was refused by the drawee, that it has never reached the hands of a *bona fide* holder, and that he is ready to surrender it to the maker upon the trial, these facts would go in mitigation of damages, and the recovery of the plaintiff would be limited to his actual loss. If, in the present case, the action was merely for the conversion of the checks, the plaintiff would be entitled to recover their face upon proof that they were paid by the New York bank, without more; but the action is for the money of the Albion bank, obtained upon its checks "paid by the New York bank out of and from the moneys and accounts of the Albion bank." If the evidence established that the checks were not paid by the New York bank out of the moneys or funds of the Al-

bion bank, but were paid out of moneys provided for that purpose by Warner, the jury should have been instructed that their verdict could be only for nominal ·damages.   But the payment of ·the checks by the New York bank was none the less a payment by the Albion bank, or a payment out .of its funds, because the latter was put in funds without the knowledge of its officers, and its correspondent paid the checks without their knowledge.   If Warner had made deposits in his own name with the New York bank, and that bank, pursuant to his instructions, had charged the checks, when it paid them, against his account, the defendants might well insist that the checks were not paid by the Albion bank, or out of its funds.   Under such circumstances, the plaintiff would certainly be required to prove that the deposits made by Warner were funds of the Albion bank.   But when Warner caused deposits to be made with the New York bank in the name of the Albion bank, the title to the fund created by the deposits vested in the latter as against Warner.   When the New York bank credited the Albion bank with these deposits, it assumed the relation of a debtor, not to Warner, but to the Albion bank, for ·the amount; and when it paid checks drawn against the fund, and charged them to the Albion bank, it paid them out of the funds of the Albion bank, as between itself and the Albion bank, and as between the latter and Warner.   It may be that third persons whose moneys were misappropriated by Warner, and deposited with the New York bank to the credit of the Albion bank, can reclaim the amount of the Albion bank; but Warner himself could not, because he relinquished his title by his own act.   Whether the deposits made by him are to be regarded as the property of the Albion bank because made by a fiduciary who has willfully commingled his own funds with the trust funds in such a manner that the line of distinction between them cannot be traced, or as voluntary payments, which he cannot reclaim because they were voluntary, need not be considered.   He doubtless made them to conceal his use of the funds of the bank, knowing that he could not overdraw the account of his bank with the New York bank without risk of detection.

The defendants have no interest in the question whether the Albion bank paid the checks out of the moneys for which it is accountable to third persons, or even out of the money for which it may be accountable to Warner.   It suffices that the checks were paid out of funds to which it had the legal title.   Nor is it material that the defendants paid to Warner various sums of money which were ultimately received by the bank of Albion.   It was open to the defendants to show upon the trial that the Albion bank did not eventually sustain any loss by Warner's misappropriation of its checks or moneys, and thus reduce the plaintiff's recovery to nominal damages.   This they did not attempt otherwise than by showing that Warner deposited various sums of money to the credit of the Albion bank, which were not charged by that bank to the New York bank.   The presumption is as cogent that these deposits, secretly made by Warner, represented the moneys which he knew belonged to the Albion bank, as that they were his own money.   The

case for the plaintiff was complete when it appeared that the checks which were wrongfully received and collected by the defendants had been paid by the New York bank out of funds standing to the credit of the Albion bank. He was then entitled to recover the full amount. It was unnecessary for him to assume the affirmative, and show that the deposits made by Warner in the New York bank were not the funds of Warner, but consisted of misapplied funds of the bank, or the proceeds of securities belonging to it, or for which it was responsible to others; but it was for the defendants to prove that, notwithstanding their wrongful participation with Warner in misappropriating the funds of the bank, the bank did not suffer loss. If they had shown that all his misappropriations had been made good by the return of what he had misapplied, it is not entirely clear that they would have been liable only for nominal damages. *Hanmer* v. *Wilsey*, 17 Wend. 91; *Otis* v. *Jones*, 21 Wend. 394; *People* v. *Bank*, 75 N. Y. 547. These cases hold that the defendant in an action for conversion of property can only claim a mitigation of damages because of a return of the property, where the owner has accepted its return, or has resumed dominion over it as owner; and that it is not enough that the property, without his consent, has been applied to the satisfaction of his debts. It is not necessary to consider whether this doctrine should be applied to a case for the conversion of money which has been returned to the owner, and used by him without knowledge of the conversion or restitution. Here all the money returned by Warner was insufficient to replace his defalcations, by an amount much larger than the sum sought to be recovered of the defendants, and the bank had no knowledge that he had returned anything to replace what he had misapplied until he had again misappropriated it. It is not unjust or unreasonable to compel the defendants to restore such of the funds of the bank as they received when they are unable to prove that the bank was not directly or ultimately a loser in consequence of their acts. It may be that Warner would have misappropriated the money of the bank in other ways, if they had refused to receive the checks, but certainly one temptation would not have been in his path if he had found that he could not use the paper of the bank for his speculations with the same facility as though it were his own money.

Several points discussed upon the motion for a new trial, among them the point that the jury should have been instructed not to include interest in their verdict accruing before the commencement of the suit, do not seem to merit consideration. The views expressed cover all the controlling questions in the case, and lead to a denial of the motion.