ST. CHARLES SAVINGS BANK v. GEO. L. ED-
WARDS, HARRY F. KNIGHT, J. HERNDON
SMITH and THEODORE D. PECK, Doing Bus-
iness Under Name and Style of A. G. EDWARDS
& SONS, Appellants.

**Division Two, June 1, 1912.**

1. **APPEAL: Improper Abtract: General Rule.** An appellant
   will not be denied a hearing on appeal on the sole ground
   that he has not presented his abstract in proper form, unless
   the form used is clearly violative of the statute and rules
   of court. Where the point made against the abstract is at
   least doubtful, it will be ruled against the respondent.

2. **PLEADING: Amended Petition: Partners: Change in Cause
   of Action.** Where plaintiff filed suit against four persons as
   partners, and failing to prove that one of them was a member
   of the firm at the time of the transactions involved dismissed
   as to him, an amendment of the petition so as to adjust it to
   such dismissal, leaving the allegations as to partnership in
   full force as to the remaining three defendants, did not change
   the cause of action—no joint contract being involved.

3. **NEGOTIABLE INSTRUMENT: Notice of Infirmity: Sec.
   10026, R. S. 1909: Indorsee.** The holder referred to in Hamil-
   ton v. Marks, 63 Mo. 167, and in Sec. 10026, R. S. 1909, of the
   Negotiable Instrument Law, reading, "To constitute notice of
   an infirmity in the instrument or defect in the title of the
   person negotiating the same, the person to whom it is negotiated
   must have had actual knowledge of the infirmity or defect, or
   knowledge of such facts that his action in taking the instru-
   ment amounted to bad faith," is an indorsee—one to whom the
   paper has been negotiated by an indorsement by the payee or
   a prior indorser—and not a payee. Neither that statute nor the
   decision in that case has any application to the sufficiency of
   the constructive notice of an infirmity in the title of the drawer
   of a check imparted to the payee by the check itself and the
   correspondence and attendant circumstances. The payee is not
   entitled to any immunity based on the negotiable character of
   the paper.

4. ————: ————: **Agent: Scope of Powers: Cashier of Bank:
   Checks for Own Use.** An agent cannot act both for his principal
   and himself in a transaction wherein their interests are
   antagonistic. The cashier of a bank has no authority to draw
   checks in the name of the bank for his private use and benefit,

and none is to be implied, and that is known by those who deal with him. Such unauthorized acts can be validated only by express authority from his principal, and the burden is upon the agent and upon those who profit by his checks, with knowledge of the antagonistic relation, to show such express authority.

5. ———: ———: ———: ———: ———: Acceptance. A firm who accepted checks of a bank drawn by its cashier upon another bank to the firm as payee, who had actual knowledge that they were drawn for his own use in payment of his individual debt to the firm, accepted them at their peril, and with the risk of his authority to draw and use the checks of the bank.

6. ———: ———. Cashier of Bank: Presumption of Authority to Draw Check. The payee knows that the cashier of a bank is acting beyond the limit of his general authority when he draws a check in the name of the bank to pay his own individual liability to the payee, and that without special authorization such check is invalid; and he has no right to presume that the cashier paid for the check and was acting honestly. When the bank sues the payee to recover the money obtained on such checks, the liability of the payee is not to be settled by presumptions, but, the payee knowing that the checks were drawn to pay the cashier's debt to him, the primary question which arises upon the face of the transaction is, did the cashier have authority to execute in the name of the bank checks in payment of his individual debts? And the burden of showing he had such authority is on the payee, for a check so drawn is prima facie invalid.

7. ———: ———: ———: ———: One of Two Innocent Purchasers. The rule that where one of two innocent persons must suffer by the acts of a third he who enabled such third person to occasion the loss must sustain it, has no application in a suit brought by a bank against the payee of checks to recover the amount it lost upon checks drawn by its cashier in its name upon another bank in favor of the payee who knew that the checks were given to him in payment of his individual debt to the payee—for two reasons: first, because the payee was bound to know that the cashier had no authority, unless specially so authorized, to draw checks in the name of the bank to pay his individual debt to the payee; and, second, because the payee, although innocent of knowledge of the cashier's actual fraud, cannot be said to be an innocent party in a legal sense— especially where he might have safely assumed that the bank did not know that the cashier was speculating in grain and stock and drawing the checks to the payee (a commission broker) in payment of his debts on that account.

Appeal from St. Louis City Circuit Court.—*Hon. Hugo Muench,* Judge.

AFFIRMED.

*George L. Edwards* for appellants.

(1) The court permitted the plaintiff during the trial to amend its petition, so as to substitute new causes of action in lieu of the one at first declared upon, and to recover upon causes of action not declared upon in its petition. A change by amending the petition from a suit against a partnership to a suit against individuals is a substitution of a new cause of action, and to permit a recovery against individuals in a suit against a partnership is to allow a recovery on a cause of action not pleaded. Sears v. Mortgage Co., 56 Mo. App. 122; Myers v. Railroad, 120 Mo. App. 288; Watson v. Boland, 136 Mo. App. 622; Steele v. Braizer, 139 Mo. App. 337; Purdy v. Pfaff, 104 Mo. App. 339; Dunlap v. Kelly, 105 Mo. App. 7; Scoville v. Glassner, 79 Mo. 449; Liese v. Myer, 143 Mo. 547; Slaughter v. Davenport, 151 Mo. 26; Timber Co. v. Railroad, 180 Mo. 420; Yall v. Gillham, 187 Mo. 393; McHugh v. Transit Co., 190 Mo. 85. (2) The retirement of a member or addition of a member of a partnership, *ipso facto* operates as a dissolution of the firm. Spaunhorst v. Link, 46 Mo. 199; Seuffert v. Gille, 230 Mo. 479. (3) The causes of action declared upon by plaintiff were barred by the Statute of Limitations, Sec. 4273, R. S. 1899, at the time when plaintiff amended its petition. Buell v. Transfer Co., 45 Mo. 563; Sims v. Field, 24 Mo. App. 566; Wasson v. Boland, 136 Mo. App. 622. (4) Since the drafts in question were negotiable and the defendants acquired them for value, prior to maturity, and without any actual knowledge of any defect or infirmity therein, the plaintiff cannot recover. Notice of a defect or infirmity in a negotiable instrument cannot be imputed

to an innocent holder for value prior to maturity, by constructive notice. Nothing short of actual bad faith will impeach his title. Sec. 10026, R. S. 1909; Hamilton v. Marks, 63 Mo. 167; Banking Co. v. Comm. Co., 195 Mo. 262; Coleman v. Stocke, 139 S. W. 216. (5) The doctrine is well established that in the absence of evidence to the contrary, the presumption always prevails that public officers have discharged their duties properly. This doctrine of presumption has been applied to persons generally, and it has been held that every man is presumed to have performed all of his official and social duties. Mathias v. O'Neil, 94 Mo. 520; Blodgett v. Schaffer, 94 Mo. 552; Agan v. Shannon, 103 Mo. 661; Bluedorn v. Railroad, 108 Mo. 439; State v. Bank, 120 Mo. 161; Chouteau v. Railroad, 122 Mo. 375; State v. Crumb, 157 Mo. 556. (6) Where one of two innocent parties must suffer for the wrongful act of another, the one who puts the party in position to do it must be the sufferer. Lee v. Turner, 89 Mo. 489; Neuhoff v. O'Reilly, 93 Mo. 170; Banking Co. v. Comm. Co., 195 Mo. 262.

*Edward D'Arcy* and *Percy Werner* also for appellants.

(1) Under the "Negotiable Instruments" statute (Sec. 10026, R. S. 1909) "to constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." In this case the trial court directly found that defendants had taken the drafts in question "for full value in good faith, and without actual knowledge of any fraud or irregularity on the part of A. F. Mispagel in issuing the same." (2) Under the Negotiable Instrument statute (Sec. 10026), where the negotiable paper is taken without actual knowledge of infirmity or

defect and in good faith for full value, the right of the holder is absolute and cannot be defeated by any mere presumption. Reeves v. Letts, 143 Mo. App. 199; Bank v. Leeper, 112 Mo. App. 694; Bank v. Russell, 139 S. W. (Tenn.) 735. (3) The court, sitting as a jury, gave the following instruction: "The court finds from the evidence that the defendants received the drafts in question from A. F. Mispagel for full value in good faith, and without any knowledge of any fraud or irregularity on the part of A. F. Mispagel in issuing the same." Under this instruction it was clearly error to find for the plaintiff. (4) Sec. 10026 of the Negotiable Instrument statute affects, limits and relates to the remedy and not to the validity of the instrument sued on, and applies to all suits brought after the passage of the act, and should have governed the trial court in this case. 8 Cyc. 935; Hand v. Ballon, 12 N. Y. 541; Lord v. Chadbourne, 42 Me. 429; Commonwealth v. Hampden Co., 23 Mass. 501; Winslow v. People, 17 Ill. App. 222.

*T. C. Bruere, Lon O. Hocker* and *C. W. Wilson* for respondent.

(1) The judgment of the circuit court should be affirmed because the case is brought to this court by simply filing here a certified copy of the judgment and order granting the appeal, whereas the printed abstract of the record furnished by the defendants is fatally deficient in these particulars: (a) It fails to set out the judgment or to advise the court against what parties the judgment was rendered. (b) It sets out no record entry of the order granting the appeal. (c) It fails to set out any record entry showing that the bill of exceptions in the case was ordered filed and as a matter of fact filed and made a part of the case. Supreme Court Rule 16; St. Charles v. Budd, 174 Mo. 122; Storage Co. v. Glasner, 150 Mo. 426; State v. Walker, 194 Mo. 375; Bondurant v. Ins.

Co., 73 Mo. App. 477; Bower v. Daniel, 198 Mo. 317.
(2) The cashier of a bank has no right to issue drafts
on its correspondents in payment of his individual
debts, and a creditor of a cashier who receives such
drafts, takes them with notice that the cashier is ap-
propriating the assets of the bank for the payment of
his individual debts. The form of the draft itself puts
the creditor on inquiry and is notice to him of the fact
that the cashier is using the bank's funds in his pri-
vate business. Kitchen v. Comm. Co., 105 Mo. App. 463;
Banking Co. v. Comm. Co., 195 Mo. 262; Lee v. Smith,
84 Mo. 304; Lamson v. Beard, 94 Fed. 30; Gale v. Bank,
104 Fed. 214; Bank v. Investment Co., 140 S. W. 921.
(3) There is nothing in the contention made by ap-
pellants that they took the drafts from Mispagel for
full value and in good faith, and without actual
knowledge of any actual fraud and cannot be held re-
sponsible under the Negotiable Instruments statute.
The statute has no application in the case. The drafts
were issued directly to defendants by Mispagel. The
instruments themselves were in such form as to im-
part notice to defendants that Mispagel was using
bank assets in payment of his private debts. Sec.
10026, R. S. 1909; Kitchen v. Comm. Co., 105 Mo. App.
463; Banking Co. v. Comm. Co., 195 Mo. 262; Bank v.
Investment Co., 140 S. W. Rep. 921. (4) Nor is
there anything in the claim that error was com-
mitted in allowing plaintiff to dismiss as to T. D.
Peck. Plaintiff had a right to recover against those
persons who constituted the firm of A. G. Edwards &
Sons at the time the drafts were issued to and col-
lected by the firm. If Peck was not a member of
the firm then, the plaintiff had a perfect right to dis-
miss as to him and recover against those who were.
This was all that was done in this matter. Secs. 2772,
1981, 1734, 2769, R. S. 1909; Simpson v. Schulte, 21
Mo. App. 639; Gates v. Watts, 54 Mo. 590; Priddy v.
Mackenzie, 205 Mo. 194; Mfg. Co. v. Horn, 112 Mo.

App. 722; Crews v. Lackland, 67 Mo. 619; Mc-Lean v. McAllister, 30 Mo. App. 109; Bryant v. Haw-kins, 47 Mo. 410; Bank v. Cotey, 70 Mo. 150; Willis v. Barron, 143 Mo. 456.

FERRISS, J.—This controversy arises upon the following facts, which are not substantially con-troverted:

The plaintiff is a banking institution, located at St. Charles, Missouri. From 1890 to 1904 its cashier was one A. F. Mispagel. The appellants, during the year 1903, were engaged in St. Louis in the grain and stock brokerage business as partners under the firm name of A. G. Edwards & Sons. From February 12, 1903, to November 25, 1903, Mispagel was dealing in stocks and grain on open account with appellants' firm. From time to time, upon request from appellants, Mispagel sent them remittances to apply to his credit on this account. Such remittances, during the period mentioned, amounted in the aggregate to about $9,500. They were made in the form of checks drawn by the St. Charles Savings Bank, by Mispagel, cashier, on its depository bank in St. Louis, payable to the order of A. G. Edwards & Sons. There were thus remitted sixteen checks at different dates and for different amounts. Of these the following, which differs from the others only as to date and amount, may be taken as an example:

ST. CHARLES SAVINGS BANK. No. 7555
St. Charles, Mo. Sept. 30, 1903.
Pay to the order of A. G. Edwards & Sons $650.00 (six hundred and fifty dollars.)
To THE MECHANICS' NATIONAL BANK,
St. Louis, Mo.
A. F. Mispagel, Cashier.

Each and all of said checks were indorsed by A. G. Edwards & Sons, collected by them, and the pro-

ceeds credited to the individual account of Mispagel current in said stock and grain operations. Each remittance was made in response to a written request addressed to Mispagel personally, and referring to his individual account. The following may serve as an example of the form and general tenor of such letters:

St. Louis, Aug. 19, 1903.

Mr. A. F. Mispagel,
    St. Charles, Mo.
Dear Sir:

Your grain account with us needs $600 at close tonight. Kindly send us your check for this amount, and oblige

Yours truly,
A. G. Edwards & Sons.

In their written acknowledgments, Edwards & Sons sometimes say "your check" or "check," received. In several instances the language of the receipt refers to the remittance as the check of plaintiff bank. Thus, on October 14th: "We are in receipt of check No. 7556 of the St. Charles Savings Bank for $700, drawn on the Mechanics' National Bank here, and have given credit to your stock account for that amount."

Mispagel, in various ways, concealed from the bank officials the fact that these checks were issued. He was bookkeeper as well as cashier. The bank received no equivalent for them. They were in fact misappropriations by Mispagel of the funds of the bank. No authority, either general or special, is shown in him to draw checks in the name of the bank for his individual benefit. Edwards & Sons had no actual knowledge of the fact that Mispagel was misappropriating the bank's funds. The record further concedes that appellants gave value to Mispagel for the amount of these checks by credit on his account. The

plaintiff had no interest in this grain and stock account, and was ignorant regarding the entire transaction.

Plaintiff sues to recover the amount received by defendants on each draft, the petition containing sixteen counts. The answer denies generally, pleads good faith, and further, that the checks were received in ordinary course. As no question arises on the pleadings, so far as the merits are concerned, they need not be further considered.

The case was tried by the court. Plaintiff asked no instructions. Defendants asked instructions in the nature of a demurrer to each count, which were refused, also instruction number 3, in the following form:

"The court finds from the evidence that the defendants received the drafts in question from A. F. Mispagel in regular course of business, for full value in good faith, and without any actual knowledge of any fraud or irregularity on the part of A. F. Mispagel in issuing the same."

This was given in the following modified form:

"3. The court finds from the evidence that the defendants received the drafts in question from A. F. Mispagel in regular course of *its* business *with him,* for full value in good faith, and without any actual knowledge of any fraud or irregularity on the part of A. F. Mispagel in issuing the same."

The following offered by defendants was refused:

"4. The court declares the law to be that unless the defendants had actual notice of the fraudulent acts or irregularities of A. F. Mispagel in issuing the drafts in question, then the plaintiff is not entitled to recover upon any draft the basis of any count in its petition, unless the defendants had actual notice of the fraudulent acts or irregularities of A. F. Mispagel in issuing the same."

243 Sup.—36

Judgment was rendered in favor of plaintiff for the amount claimed in each count.

I. On the threshold of the case respondent objects that there is no proper record before us. We are not disposed to turn an appellant out of court for the sole reason that he has not presented his abstract in proper form, unless the form used is clearly violative of the statute or rules of court. Here the point made is at least doubtful, and will be ruled against respondent.

II. Appellants also, before reaching the merits, object to the order below allowing respondent to dismiss as to one of the defendants named in the petition, and to amend the petition to adjust it to such dismissal, and this on the ground that such dismissal and amendment changed the cause of action. Appellants also, rather inconsistently, claim that the change to this new cause of action let in the Statute of Limitations, which ran before the amendment was made. We can find no substance in the point. The suit was filed against the appellants and one Peck as partners. Respondent failing to prove that Peck was a member of the firm at the time of the transaction involved, dropped him from the case, leaving the allegation as to partnership in full force as to the remaining three defendants. The cases cited, involving joint contracts, do not apply. There was no change in the cause of action.

III. Appellants contend that they are not liable, because of the fact that they had no actual knowledge of wrongdoing on the part of Mispagel. It is not claimed by respondent that appellants had any notice of infirmity in the title of Mispagel to the checks, other than the constructive notice imparted by the checks themselves and the correspondence connected therewith, together with the fact that Mispagel was using

the checks to pay his individual debts. Appellants earnestly contend that even if, under the earlier decisions, the face of the checks and attendant circumstances were sufficient to give such constructive notice as would invalidate their title, still, since the decision of this court in Hamilton v. Marks, 63 Mo. 167, constructive notice is not enough to impair the title of a *bona fide* holder for value. They also rely on section 10026 (R. S. 1909) of the Negotiable Instrument law, which reads as follows:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

We think appellants misconceive the situation in this regard. The "holder" referred to in Hamilton v. Marks and in section 10026 is an indorsee—one to whom the paper has been negotiated by indorsement by the payee or a prior indorser. True, the checks were negotiable, but when they were delivered to Edwards & Sons they had not been negotiated. Edwards & Sons were original parties to the paper. They were payees therein. All of the cases cited on this point by appellants in the two briefs filed, involve the rights of an indorsee—a holder for value after the paper leaves the hands of the payee. While the paper is still in the hands of the original payee, the "courier" has not started on its career without luggage.

In Lamson v. Beard, 94 Fed. l. c. 43, the court, speaking of a similar situation, says: "The drafts were drawn in favor of plaintiffs in error, and until accepted by them they were not contracts, and by accepting them they did not become assignees or purchasers of existing obligations, but simply parties to the original execution thereof, into whose rights the way to full inquiry is open, unless closed by some

estoppel outside of the paper itself, whatever its form. A primary party to the execution of instruments originated as these were cannot be a '*bona fide* purchaser' in the sense of the law merchant.''

Denying then, as we must, any immunity to appellants based on the negotiable character of the paper, we will examine their position in the light of general principles and authority.

It is hardly necessary to say that an agent cannot act both for his principal and himself in a transaction wherein their interest are antagonistic. Such action by the agent is not within the scope of his general authority, and this is known to those who deal with him. Such action by the agent could be validated only by an express authority from his principal, and the burden is upon the agent and upon those who profit by his act, with knowledge of the antagonistic relation, to show such express authority. Mispagel, the cashier, had authority to draw checks in the name of the bank in the course of the bank's business, but no authority is shown, nor is any to be implied, to draw checks in the name of the bank for his private use and benefit. True, in this case the checks were not payable to him, and did not show on their face that they were drawn for his use, and doubtless an innocent indorsee for value could collect from the bank, but the checks were drawn for his use, and of this fact the appellants had actual knowledge. With this knowledge, they accepted the checks in payment of his individual debt. They did this at their peril, taking the risk of his authority to so draw and use the checks of his principal.

This case is fairly within the doctrine of Lee v. Smith, 84 Mo. 304, where a bank cashier issued certificates of deposit to himself, and delivered them to his individual creditor in payment of his debt, having no funds on deposit against them. This creditor sought to hold the bank, claiming that as he was innocent of

knowledge of actual fraud, and believed that the cashier had funds on deposit, and inasmuch as the certificates were issued by the proper officer, the bank was liable. In denying his right of recovery, this court, said:

"It is unnecessary to consider whether the cashier of a bank has authority, as such, to certify the existence of funds in the absence of actual deposits, for no such general authority, if possessed by him, would justify him in certifying his own check, or in issuing, as he did in this case, a certificate of deposit to himself. He could not do this without representing both sides to the transaction, thus perfecting a contract through only one consenting mind, a thing positively forbidden to agents and trustees in every department of agency and trust. The law will not permit an agent's private interest to come between himself and his principal. Its actual presence always disables the agent from binding his principal in the transaction. [Claflin v. Farmers' & Citizens' Bank, 25 N. Y. 293; Mercantile Mutual Ins. Co. v. Hope Ins. Co., 8 Mo. App. 408; West St. Louis Sav. Bank v. Shawnee Co. Bank, 95 U. S. 557.] Accordingly, when Mr. Alther, as cashier of the bank, cer-. tified that Mr. Alther had deposited the money called for in these certificates, and that the bank would pay to his order the amounts so deposited, upon return of the certificates, he undertook to bind his principal in a method forbidden by law. Therefore, these certificates were presumptively void upon their face, a fact which must have been apparent to Mr. Lee, or any one else, inspecting them. The plaintiff, on accepting them, could not maintain that he was a *bona fide* holder without notice of the cashier's want of authority to bind the bank in issuing them. No implied authority in the cashier could arise from the general course of business in the bank. Nothing short of a subsequent confirmation of them by officers properly

representing the bank could give to them any force or validity whatever.''

The controlling fact in each case is the acceptance of the paper by the creditor in payment of the individual debt of the cashier. The fact that the checks were payable directly to the creditor does not distinguish the cases; nor does the difference in the form of the contract—one a certificate of deposit, the other a check,—have that effect. The cases cited in the foregoing opinion fully sustain the text, and are in point here. To the same effect is the case of Kitchens v. Teasdale Com. Co., 105 Mo. App. 463, where, under facts entirely similar to those in the case at bar, the bank recovered from the individual creditor of the cashier.

Appellants' counsel contend that the fact appeared in the Kitchens case that the creditor accepted the checks with actual knowledge of the fraud. We think counsel misapprehend the case on this point. Nothing appears in the statement of facts in the Kitchens case to show any knowledge on the part of the creditor, other than that derived from the checks and the transaction itself. The court in its opinion says: ''By the medium adopted for the transfer of the money, defendant was apprised that Ritter, by the abuse of his power as cashier, was employing the funds of his principal in speculation on his individual account, and in affairs which from their nature excluded the possibility of being concerns of the bank. That he was transcending the well known extent of his agency and using the money of his principal in his private transactions was manifest.''

So what the court says of the knowledge of the creditor means knowledge derived from the checks and the fact that. they were used to pay private debts.

Checks of the same character issued by Mispagel under the same circumstances are involved in the case

of this same plaintiff against Orthwein Inv. Co., 160 Mo. App. 369. In that case Mispagel was speculating through the Orthwein Company. The Court of Appeals sustained a judgment for plaintiff, and says:

"As the drafts were drawn by Mispagel as cashier in favor of the defendant against the account of the plaintiff bank, they disclosed on their face, to one having the knowledge defendant possessed, that Mispagel was exercising his authority as cashier or agent in favor of himself as principal. They were then presumptively void, and the obtention by the defendant of the money on them presumptively illegal, and the burden was on the defendant to overthrow such presumption."

To the same effect in principle is the decision of the Kansas City Court of Appeals in St. Louis Charcoal Co. v. Lewis, 154 Mo. App. 548.

In Campbell v. Manufacturers' National Bank, 67 N. J. L. 301, the receiver of a bank recovered from a creditor of its cashier the proceeds of a draft drawn in the name of the bank by the cashier to the order of the attorney of the creditor, to pay the debt of the cashier in which the bank had no interest. It does not appear that the creditor had any knowledge beyond the facts stated. The court says: "A person cannot deal with the cashier of a bank as an individual in securing a draft, and claim, after the draft is delivered, it has become the transaction of the bank. To make the acts of the cashier valid, the transaction in which the draft is delivered must be a bank transaction, made by the cashier, within his express or implied authority, in the conduct of the business of the bank. So long as a person deals with the cashier in a matter wherein, as between himself and the cashier, he is dealing with, or has a right to believe he is dealing with, the bank, the transaction is obligatory upon the bank."

Appellants contend that they could presume that Mispagel had paid for the checks, and that he acted rightly. They did know that the agent was acting beyond the limit of his general authority, and that, without special authorization, the checks were invalid. This threw the burden of proof on them. In Claflin v. Bank, 25 N. Y. 293, the president of the bank certified his own check drawn on the bank, and afterwards negotiated it to the plaintiffs in the case. SELDEN, C. J., says: "The Supreme Court seems to have supposed that to prevent the plaintiffs from being considered *bona fide* holders they must have known that the drawer had no funds in the bank to meet the check. This was clearly an error. The acceptance was void in the hands of the drawer, irrespective of the question whether he had or had not such funds. The double relation in which Mr. Houghton stood alone rendered it void, and of this the plaintiffs were apprised by the check." And SMITH, J., said: "Houghton had no power to accept his own drafts or checks in behalf of the bank. The act was a palpable excess of authority, and any person taking the paper was bound to inquire as to the power of the agent so to contract."

The case of Lamson v. Beard, 94 Fed. 31 (U. S. Cir. Ct. App.), presents facts identical with those under consideration. There the president of the bank, privately speculating, paid his debts to the commission company with checks of his bank drawn by him to order of his creditor. The bank recovered from the commission company, which had received the checks in payment of the aforesaid private debt of the president. Speaking of the claim made there, as it is here, that such checks or drafts are in constant use without inquiry, and are often made payable directly to the creditor of the purchaser thereof, the court says: "But in such cases the creditor may accept the draft without inquiry, not, as counsel have said, because of a presumption that the debtor had paid for the draft,

but because the draft had been drawn by the author-ized officer of the bank in the usual course of busi-ness, acting without apparent or known personal inter-est in the transaction.'' And further: ''The one thing necessary to be known was whether Cassatt [the president] had authority to make the proposed use of the bank's paper.'' And again: ''The drafts bore proof on their face that they were drawn upon the funds of the bank, that they were not drawn in the course of the bank's business, but in discharge of individual liabilities of the president of the bank to themselves, they, of course, understood. They there-fore knew that unless there had been conferred upon Cassatt an unusual and special authority, like that given the cashier in Goshen Nat. Bank v. State, supra, to sign and issue drafts of the bank in his private transactions, the paper sent them was unauthorized, and that for the proceeds thereof they would be liable to the bank or its representatives.'' The court held that it was the duty of the individual creditors of the president, under such circumstances, to make inquiry as to his authority to issue the checks of the bank in payment of his individual debt. To the same effect is Anderson v. Kissam, 35 Fed. 699.

The appellants urge that they had a right to pre-sume that Mispagel paid the bank for the checks, and that he acted honestly. The case is not to be settled by presumptions. The primary question which arose upon the face of the transaction was, did the cashier have authority to execute in the name of the bank drafts or checks in payment of his individual debts? True, if he had paid value to the bank for the checks, plaintiff would not have been injured, and hence could not have recovered; but this contract made by the trustee in the name, and on behalf, of his principal, for his own benefit, was, in the hands of the appellants who accepted it with knowledge of such fact, prima facie invalid as against the principal. The burden was

therefore upon them to show that these special contracts were authorized, or that the bank had received full value.

Appellants also urge the rule that where one of two innocent parties must suffer by the acts of a third, he who enabled such third party to occasion the loss must sustain it. That rule has no application here. It will hardly be urged that every employer is within this rule, merely because of the fact of employment. It is not shown that the bank did anything which would relieve appellants from the obligations which we have ruled were imposed upon them by this transaction. Again, under the views herein expressed, the appellants, although innocent of knowledge of actual fraud, cannot be said to be innocent parties in a legal sense and within the meaning of the rule herein invoked. The able counsel for appellants will not claim that one is an innocent party in the sense under discussion, merely because he innocently acted in ignorance of his legal duty. One thing the appellants knew which we think they might safely have assumed the bank did not know, namely, that the cashier was speculating in grain and stocks.

This case is a hardship on appellants, who, aside from their commissions, doubtless profited nothing in the transaction, but we cannot for this reason relax the rigorous and wholesome rule of law which renders suspicious, and worthy of inquiry, every contract which an agent assumes to make for his own exclusive benefit in the name of his principal.

The record is in some respects somewhat meager, but it justifies the judgment below, which is affirmed.

*Brown, P. J.,* and *Kennish, J.,* concur.