PEMISCOT COUNTY BANK, et al., Appellants and Respondents, v. TOWER GROVE BANK OF ST. LOUIS, Appellant and Respondent.

St. Louis Court of Appeals. Argued and Submitted April 12, 1920. Opinion Filed June 8, 1920.

1. **BANKS AND BANKING**: Acts of Cashier: Bank Transactions of Cashier Bind Bank. The act of a cashier of a bank in issuing a

draft is valid when the transaction in which the draft is delivered is a bank transaction, made by the cashier, within his express or implied authority, in the conduct of the business of the bank, and where a person deals with a cashier in a matter wherein, as between himself and the cashier, he is dealing with, or has a right to believe he is dealing with the bank, the transaction is obligatory upon the bank.

2. ———: ———: ———: Cashier Issuing Bank Draft to Pay Personal Checks in Due Course of Business: Bank Transaction. In an action to recover the amounts of drafts issued by plaintiff bank to the order of defendant bank on the ground that its cashier had wrongfully and unlawfully issued the drafts, etc., and so far as anything appears from the evidence, regular commercial paper was discounted at defendant bank by th ecashier of plaintiff bank and the money paid over to him, and when it became due he gave first his own check on his own bank, and then as cashier, and in the ordinary course of business issued a draft on another bank in favor of defendant bank for the amount of the check, which draft was paid and defendant bank surrendered the collateral which it held, all a matter in due course of business between the two banks, *held* that it was a transaction between the banks, and so far as defendant bank could know or was charged with knowledge the transaction was entirely regular, particularly when it held collateral for the debt which the check was intended to pay, and there was nothing in the transaction to carry any notice to defendant bank of any irregularity in it

3. ———: ———: ———: Cashier Overdrawing His Account: Knowledge of Bank Officers: Estoppel. Where the cashier of plaintiff bank discounted with defendant bank, notes of a partnership, he being a member of the firm to whose order they were issued and for whose benefit they were discounted, and it was a regular business transaction, conducted in the ordinary and usual way, and there was nothing whatever in it to convey or intimate in any way to the defendant bank that the cashier, when he discounted his notes for his concern, was dealing on his personal account any further than that he was also a member of that firm, and on failure to receive payment of the notes through its correspondent the president of defendant bank presented the notes in the absence of the cashier, and after arrangement with the partners received plaintiff's draft for the amount of the notes, part being made up by the cashier's check, *held* that there was nothing unusual about the transaction, or anything calculated to put the defendant bank on notice that the cashier was improperly using the funds of the bank in payment of his own indebtness, and that plaintiff bank could not attack the transaction in as much as the evidence showed that the cashier had frequently overdrawn his account and that he had done so with the knowledge of his fellow directors and

Pemiscot County Bank v. Tower Grove Bank of St. Louis.

officers of the bank, and that at or about the time when the cashier made his checks and draft, he had ample funds out of which to pay them deposited in plaintiff bank.

4. **APPELLATE PRACTICE:** Finding of Facts: Must Embrace All Constitutive Facts: Otherwise Open to Attack in Appellate Court. A finding of facts which does not embrace all the constitutive facts is open to attack in the appellate court.

5. **DECISIONS:** Controling Effect of. The effect of decisions is to be controlled by the facts in evidence in the particular case.

6. **BANKS AND BANKING:** Cashier Overdrawing His Account: Reimbursing Bank: Finding of Facts as to Rights of Cashier's Payee in Proceeds Material and Constitutive Issue. Where plaintiff bank attacked transactions wherein its cashier had issued its drafts to take up his personal checks, and the evidence showed that the cashier had delivered to plaintiff bank valuable properties, *held* that a finding of fact as to the rights of defendant to participate in the amount realized on such properties was a constitutive fact in issue, and the failure of the trial court to make such finding is reversible error.

7. **SUBROGATION:** Cashier of Bank Issuing Drafts for Own Use: Overdrawing: Payee in Such Drafts Entitled to Share in Proceeds of Property Conveyed to Bank to Satisfy Indebtedness. Where the cashier of a bank issued the bank's drafts in payment of his personal indebtedness, using funds of the bank, conveyed to the bank valuable properties to apply on such indebtedness, the payee of such drafts, on the transaction being successfully attacked, is entitled to participate in the amount realized on such properties.

8. **BILLS OF EXCHANGE:** Checks, Drafts, etc. Issued Without Authority: Liability of Payee: Applicability of Statute. Where plaintiff bank attacked transactions in which its cashier had issued the bank's drafts to defendant to take up his checks and the in debtedness of a partnership of which he was a member, *held* that the question of the applicability of the act in effect June 18, 1917, (Laws of 1917, p. 143), relating to the liability of a payee receiving a check or draft of an officer of a corporation, etc., was not necessary to be passed upon in view of the judgment being reversed and not remanded.

Appeal from the Circuit Court of the City of St. Louis.—
*Hon. Rhodes E. Cave,* Judge.

REVERSED AND REMANDED (*with directions*).

*J. L. Hornsby* and *John T. Fitzsimmons* for Tower Grove Bank of St. Louis.

(1) The facts in the present case are such that the rule that when an officer of a corporation pays his individual debt with the check of the corporation it bears notice on its face that it is issued without authority, does not apply. The transactions in which the two drafts in question were issued were transactions between the Pemiscot County Bank and the Tower )Grove Bank. Campbell v. Bank, 67 N. J. L. 301. (2) Defendant having paid value (Tindle's check, secured by collateral) for the draft for $2784.04, is not liable to plaintiffs on account of this draft. Bank v. Edwards, 243 Mo. 553, l. c. 569. (3.) Defendant, by reason of the conduct of Pemiscot County Bank in not returning the Tindle check for $2784.04, but, instead, sending the draft in payment thereof, having been induced to surrender to Tindle the security which it held for the payment of his check, plaintiffs are estopped to make claim against defendant. Citizens Trust Co. v. Abston, Wynne & Co., 242 Fed. 392. (4) The deeds from A. C. Tindle and wife to J. A. Cunningham, trustee, dated May 15, 1913, and May 30, 1913 (Defendant's Exhibits 1 and 3), with the written agreement between Tindle and Cunningham, dated May 15, 1913 (Defendant's Exhibit 2), constituted a mortgage on the real estate described in the deeds; and the written agreement between A. C. Tindle and J. A. Cunningham dated July 12, 1913 (Defendant's Exhibit 4) was in effect a conveyance to Cunningham of Tindle's equity of redemption in the said real estate. .The consequence of the conveyance of the equity of redemption to Cunningham, the mortgagee, was that the mortgage was extinguished and the debt secured by the mortgage satisfied and released. 27 Cyc., 1379-1380; Pingrey on Mortgages, 1055-1163; Washburn Real Prop. (5 Ed.), 202; Wonderly v. Giessler, 118 Mo. App. 708, 720-721; 22 Am. & Eng. Ency. Law, 591. (5) If the release by Tindle to Cunningham of the equity of redemption by the agreement of July 13, 1913, did not

have the effect of satisfying Tindle's indebtedness to the bank, still plaintiffs, having collected the amounts of the two drafts sued on from Tindle, have no claim against defendant. Neither plaintiffs nor Tindle having made any application of the money received by plaintiffs from the sale of Tindle's property to any specific debt of Tindle, the same should be applied to satisfying Tindle's liability on account of the two drafts sued on herein. Sparks v. Jasper County, 213 Mo. 218, 232; Threshing Machine Co. v. Mathews, 188 Mo. App. 429, 434; 2 Am. & Eng. Ency. Law, 447. Where the court is called upon to appropriate payments, the equities of third persons, although not controlling, should be considered. 30 Cyc. 1251. (6) The Act of April 9, 1917 (Laws of 1917, p. 143), relates to a rule of evidence. It abolishes an existing presumption and shifts the burden of proof. This law, merely affecting rules of evidence, is aplicable to pending causes of action. 8 Cyc., 925; Lovell v. Davis, 52 Mo. App. 342-245; O'Bryan v. Allen, 108 Mo. 227-231; In re McNaughton, 138 Wis. 179-189; 26 Am. & Eng. Encyl. Law, 696. (7) The judgment of the court is erroneous if for no other reason that that it allows plaintiffs interest on the amounts awarded them, from the dates of the payment of the two drafts described respectively in the first and second counts of plaintiffs' petition. Dougherty v. Chapman, 29 Mo. App. 233; 5 Corpus Juris, 1412; Lowndes v. Bank, 82 Conn. 8; Bank v. Investment Co., 160 Mo. App. 379.

*W. M. Fitch* and *Homer Hall* for Pemiscot County Bank, Citizens Trust Company.

(1) The evidence as to Johnson's indebtednes to the plaintiff bank and of his insolvent condition ought to have been admitted, for even though the directors of the bank permitted overdrafts, proof of Johnson's condition would have proved or furnished the basis for proving that Tindle had no authority to allow an overdraft

such as Johnson's would have amounted to if his check had been accepted and charged to his account. (2) The bank, at the time of making the alleged verbal acceptance, had no funds of W. H. Johnson, the drawer, on deposit, and, therefore, such acceptance is within the Statute of Frauds as an agreement to pay the debt of another, and is not valid. 5 R. C. L. 518. (3) The principle that an agent cannot bind his principal, even in matters touching his agency, when the other party knows he is acting for himself or has an adverse interest, controls in this case, and Tindle, as cashier, had no inherent power to bind the plaintiff bank by accepting Johnson's check drawn upon the bank, when he had no funds on deposit. McCullom v. Mermod, Jaccard & King Jewelry Co., 218 S. W. 345; 3 R. C. L. 446, 447, 454; Chew v. Ellingwood, 86 Mo. 260, 272. The bank cannot be charged with the knowledge which Tindle had of the transaction involving Johnson's check, because a principal will not be held to know that which is only known to the agent concerning a transaction wherein the agent is directly interested and his interest is antagonistic to the interest of the principal. Citizens Trust Co. v. Tindle, 194 S. W. 1066; Bank v. Thayer, 184 Mo. 61, 94, 95. (4) Acceptance of a bill of exchange must be in writing. Sec. 10102, R. S. of Missouri 1909. Checks are bills of exchange, and the Negotiable Instruments Law applies to them and requires their acceptance to be in writing. Sec. 10155, R. S. of Missouri 1909. A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable unless and until it accepts or certifies the check. Sec. 10159, R. S. 1909. (5) The plaintiff bank, as drawee of the Johnson check, never gave an acceptance of the check in writing, and signed by it as required by section 10102, Revised Statutes of 1909, and therefore, it never became liable on said check. The mere fact that the check was never returned to defendant does not constitute an acceptance. The plaintiff cannot be held to have accepted the check on the ground that it re-

fused to return the check within twenty-four hours, accepted or non-accepted, under the provisions of section 10170, Revised Statutes of 1909, because there was no demand made by defendant for its return, and without a demand there was no refusal. Dickinson v. Marsh, 57 Mo. App. 566, 569; Rousch v. Duff, 35 Mo. 312. (6) The court could not lawfully separate or segregate the valid from the invalid, the honest from the fraudulent, the good from the bad, as it attempted to do by excluding the Johnson check from its finding and judgment. The fraud in the transaction tainted and vitiated the entire transaction and made the entire draft void. The finding and judgment ought to be for plaintiffs for the full amount of the draft. Balz v. Nelson, 171 Mo. 682, 687; Cole v. Cole, 231 Mo. 236, 260. (7) The draft upon its face carried notice of its irregular and illegal character and was presumptively void. The burden of proof was therefore upon the defendant to show the draft was duly authorized or that the bank had received full value therefor. Defendant wholly failed to make such proof, and the judgment ought, therefore, to be for plaintiffs for the full amount of this draft. Lee v. Smith, 84 Mo. 304, 310; St. Louis Charcoal Co. v. Lewis, 154 Mo. App. 548: McCullam v. Buckingham Hotel Co., 198 Mo. App. 107, 199 S. W. 417; McCullam v. Mermod, Jaccard & King Jewelry Co., 218 S. W. 345.

STATEMENT.—This action was instituted in the circuit court of the city of St. Louis, June 4, 1914, by the Pemiscot County Bank and the Citizens Trust Company, the liquidating agent of that bank, both of Caruthersville, Missouri, against the Tower Grove Bank of St. Louis, to recover the amount of two drafts issued by the Pemiscot County Bank to the order of the Tower Grove Bank, one dated at Caruthersville, Mo., March 10, 1913, drawn on the Security Bank and Trust Company, Memphis, Tenn., for $2784.04 and the other dated at Caruthersville, Mo., December 24, 1912, drawn on the National Bank of Commerce, St. Louis, for $3060.88, and which drafts plain-

tiffs allege in their petition, drawn in two counts, A. C. Tindle, cashier of the Pemiscot County Bank, unlawfully and wrongfully issued and converted to his own use, and fraudulently and unlawfully filled out by writing in the name of defendant Tower Grove Bank, and then delivered the drafts to defendants, and plaintiffs prayed judgment against defendant for the amount of the drafts, aggregating $5844.72, together with interest from the dates of the drafts and for costs.

Defendant's answer to each count of the petition consists of a general denial, with the further answer to the first count that as to the draft for $2784.04, described in the first count, defendant on March 7, 1913, received for value of A. C. Tindle his personal check drawn on the Pemiscot County Bank in favor of defendant for $2784.04, and on or about that date, defendant presented the check to the Pemiscot County Bank for payment by mailing the same at the city of St. Louis, to the Pemiscot County Bank at Caruthersville, Mo., with a written request that the Pemiscot County Bank remit defendant a draft for that amount in payment of the check; that on March 13, 1913, defendant received of the Pemiscot County Bank in payment of the check of Tindle a draft drawn by the Pemiscot County Bank on the Security Bank and Trust Company of Memphis, Tenn., for the amount, which draft was thereafter in due course paid to defendant by the Security Bank and Trust Company; further, that defendant held, as security for the payment of this check of Tindle, certain property of Tindle, which defendant surrendered upon the payment to it of the draft. Wherefore defendant claims that plaintiffs are estopped to claim that the draft was fraudulently issued. Defendant's answer further states that the Pemiscot County Bank continued in active banking business for several months after the issuance by it of the draft to defendant, and that Tindle continued to act as its cashier, and that at several times thereafter Tindle had on deposit in plaintiff bank funds greater in amount than the amount of the draft, and if the Pemiscot County Bank had any

claim against Tindle on account of the issuance of the draft, it could have satisfied its claim out of the funds of Tindle thus in its possession; that thereafter Tindle became insolvent and was insolvent at the time of the alleged demand by plaintiffs of defendant for payment of the amount of the draft. The answer further states that the check drawn by Tindle on the Pemiscot County Bank to the order of defendant, and presented for payment on March 8, 1913, has been retained by the Pemiscot County Bank, which has accepted the same and is therefore estopped to claim anything on account of the draft issued in payment of the check. The answer further sets up conveyances by Tindle and his wife of certain real estate, which it avers was accepted in full payment and satisfaction of all liability of Tindle to the bank, including the liability, if any, on account of the issuance and delivery of this draft to defendant, and that the bank or its co-defendant had realized a large amount—about $70,000—on these assets.

Defendant's answer to the second count of plaintiffs' petition stated that on December 24, 1912, it was the holder for value of the individual check of A. C. Tindle of that date, drawn on the Pemiscot County Bank to the order of one John Schmoll and by him indorsed in blank, dated December 24, 1912, for $500, and that it also at that time held a check of the same date drawn by Tindle on the Pemiscot County Bank to the order of defendant for $1280.44, and at the same time was the holder for value of a check of the same date drawn on the Pemiscot County Bank to the order of defendant by one W. H. Johnson for $1280.44, and that on December 24, 1912, it presented to the Pemiscot County Bank the three checks. aggregating $3060.88, for payment, with the request that the checks be paid by a draft drawn by the Pemiscot County Bank to the order of defendant, and that the Pemiscot County Bank then and there accepted these three checks, and in payment thereof delivered to defendant the draft of the Pemiscot County Bank, dated

December 24, 1912, drawn on the National Bank of Commerce in St. Louis, to the order of defendant for $3060.88. The answer to the second count contains the same additional defenses made in answer to the first coun? as hereinbefore stated, as to the conveyances by Tindle, except the defense with reference to the collateral security held for the payment of the Tindle check, mentioned in the answer to the first count.

A general denial by way of reply was filed.

The case was tried before the court, a jury having been waived.

The facts appearing from the evidence were, in substance, that in 1912, A. C. Tindle was cashier of the Pemiscot County Bank, at Caruthersville, Mo., and had been in the employ of the bank for about fifteen years and had been its cashier for about seven years; that during 1912 and prior thereto Tindle, who was a stockholder in the Tower Grove Bank, had been an occasional borrower from that bank, either directly on his own note or by discounting notes executed by others; that in November, 1912, the Tower Grove Bank held two notes which had been discounted by it for Tindle.

The cashier of the Tower Grove Bank, called as a witness by plaintiffs, under examination by counsel for plaintiffs, testified as to this draft for $3060.88, that the Tower Grove Bank had received two notes, one for $4007.74, signed by H. Anderson, indorsed by the Concord Mercantile Company, the other for $322.40, signed by W. M. Baker, indorsed by the Concord Mercantile Company, and that it was part settlement of these notes that this draft was issued. The witness further testified, in answer to a question from the court, that the name of Tindle did not appear anywhere on these notes. Asked by counsel for plaintiffs if he knew Tindle personally, he said "Yes;" and asked if he knew that Tindle was a partner in the firm doing business as the Concord Mercantile Company, he answered "No." Witness further testified that these two notes were indorsed in blank and Tindle sold them to the Tower Grove Bank.

"They may have been indorsed by Tindle," said wit-
ness, "but the records of the Tower Grove Bank did
not show that they were." The defendant bank bought
these notes on February 15, 1912, and one of them be-
came due December 20, 1912, the other December 11,
1912, and the bank had made demand on Tindle for the
payment of the notes. These notes had been discounted
in the defendant Bank by Tindle. Asked that if Tindle
had not then told him that he was a partner in the Con-
cord Mercantile Company, and if he had not accepted the
notes on the strength of the fact that he was a partner
in that company, witness answered that he did not re-
member that Tindle had told him that; and he repeated
that he did not think that he knew at the time that Tin-
dle was a partner in that concern; that all the transac-
tions about these notes were between himself and Tindle.
Witness said he had stated that Tindle had in all prob-
ability indorsed these notes, but the records of the bank
do not show that. Tindle received the money on these
notes, that is on the Baker and Anderson notes, indorsed
by the Concord Mercantile Company, to which company
they were payable. Witness further testified that along
in November, the Pemiscot County Bank, through Tindle,
its cashier, wrote to the Tower Grove Bank, asking that
these notes, then about to mature, be sent to Caruthers-
ville for payment. The defendant bank thereupon sent
these notes to its correspondent at Caruthersville (not
the Pemiscot County Bank) for collection. It was in
evidence that the Concord Mercantile Company, the
holder and indorser of these notes, was a partnership
composed of A. C. Tindle, W. H. Johnson and R. F. Cop-
page. These notes still remaining unpaid on December
22, 1912, Schmoll, the president of defendant bank, went
to Caruthersville to see about their collection. Mr.
Schmoll got the notes from the local bank to which they
had been sent for collection and called at the Pemiscot
County Bank on December 23rd. Learning that Tindle
was out of town and would return the next day, he called
upon J. A. Cunningham, president of the Pemiscot Coun-
ty Bank, at his store near the bank. Schmoll testifies

that he told Cunningham of the purpose of his visit to Caruthersville and Cunningham told him that he thought Tindle had money on hand and would 'be prepared to pay the notes. On the next day, December 24th, Schmoll again called at the Pemiscot County Bank and saw Tindle, who stated that he was prepared to pay his share, one-third, of the Concord Mercantile Company's notes, provided that his partners, Coppage and Johnson, would pay their respective proportions. Schmoll then saw Coppage, who informed him that Tindle had in his hands $500 of the partnership funds to apply on this note, and that if Tindle would pay Schmoll this $500 and his share of the balance of the note and Johnson would pay his share, then he (Coppage) would pay his proportion. Schmoll then returned to Tindle, who thereupon gave Schmoll his (Tindle's) check drawn on the Pemiscot County Bank, to the order of Schmoll, for $500, representing the money paid Tindle by Coppage on partnership account, and in Tindle's hands, and at the same time Tindle gave Schmoll his own check for $1280.44, drawn on the Pemiscot County Bank, to the order of the Tower Grove Bank. Johnson then gave Schmoll his check, also drawn on the Pemiscot County Bank to the order of the Tower Grove Bank, for a like sum of $1280.-44, and Coppage thereupon gave Schmoll his check for a like amount, $1280.44, drawn on another bank in Caruthersville, these checks covering the amount due on the Concord Mercantile Company's notes. Schmoll took Coppage's check to the bank in Caruthersville on which it was drawn and obtained a draft from that bank in payment of Coppage's check for $1280.44. He then returned to the Pemiscot County Bank and presented the three checks which he held, drawn on that bank, that is, the two signed by Tindle for $500 and $1280.44, respectively, and one by Johnson for $1280.44, and requested of the assistant cashier, Thomas Ward, to whom the checks were presented, a draft on St. Louis for the amount of these three checks, aggregating $3060.88. Schmoll testified that Ward thereupon took the checks, made an examination of certain books of the bank and

shortly returned with the draft for $3060.88, which is the draft mentioned in the second count of plaintiffs' petition, and which draft was signed on behalf of the bank by A. C. Tindle, cashier. Schmoll testified that he then called at the store of Cunningham, the president of the plaintiff bank, and showed Cunningham the drafts he had received in payment of the checks given for the Concord Mercantile Company's notes, and that Cunningham said he was glad that Schmoll had gotten the matter satisfactorily arranged. Tindle, whose deposition was read at the trial, deposed that after Schmoll's first call on him at the bank on December 24th, he saw J. A. Cunningham, president of his bank, and spoke to him about the purpose of Schmoll's visit and stated to Cunningham that he would be unable to pay Schmoll without overdrawing his account in the Pemiscot County Bank, and that Cunningham replied that he had better settle with Schmoll and if it were necessary to make an overdraft, to do so. Tindle further deposed that later Cunningham stated to him that Schmoll had told him (Cunningham) that "the settlement had been made and everything paid up." Tindle also testified that although the payment by the Pemiscot County Bank of his check of December 24, 1912, produced an overdraft in his account in the bank of a few hundred dollars, a deposit of three or four thousand dollars made by him in the bank about January 10, 1913, much more than made good this overdraft; he further testified that on March 10, 1913, when the Pemiscot County Bank issued the draft for $2784.04 in payment of his check he had sufficient money to his credit on the books of the bank with which to pay the check. This was not contradicted, although the subsequent examination of the books showed that Tindle, while having moneys to his credit on the books, was, in fact, largely indebted to the bank. Tindle further testified that the officers of the bank knew he issued drafts of the bank in payment of his individual checks when such checks were presented for payment and such drafts requested by the holders of the checks.

It appears that the draft received by Schmoll from the Pemiscot County Bank, except that portion which was printed, was in the handwriting of Tindle, including, of course, his signature.

Ward, the assistant cashier of the Pemiscot County Bank, testified that he had no recollection whatever of seeing Schmoll in Caruthersville on December 24th, the date of the issuance of the draft in question.

J. A. Cunningham, the president of the plaintiff bank, testified that Schmoll called on him at his store on December 23, 1912, and stated that he had been over to the bank to see Tindle, but found him out of town, and that he (witness) replied that Tindle would probably return the next day. But Cunningham testified that there was no further conversation regarding the payment of the claim which Schmoll paid, and that this was the only interview that he had with Schmoll during the latter's visit to Caruthersville, and he denied having had any conversation with Tindle about the matter in question, or any further conversation with Schmoll. He also testified that the business of his store was heavy at that time and demanded his attention and he was seldom at the bank and had little to do with its active management —meeting about once a month with the directors.

After Schmoll's return to St. Louis, the draft issued by the Pemiscot County Bank for $3060.88, which was drawn on the National Bank of Commerce in St. Louis, was, in due course, paid.

As to the other draft mentioned in plaintiffs' petition, and which, though second in order of date, is set out in the first count of the petition, the facts as they appear from the evidence, are that on March 7, 1913, A. C. Tindle delivered to defendant at its bank in St. Louis his personal check of that date, drawn on the Pemiscot County Bank to the order of defendant, for $2784.04, as part of the payment in full then made by Tindle of certain notes of third parties then held by defendant, and which had been previously discounted by it. Defendant on the same day that it received this check from Tindle, mailed it to the Pemiscot County Bank at Caruthersville

for payment, with the request that that bank mail to defendant a draft in payment of the check; that on March 13, defendant received, by mail, from the Pemiscot County Bank, the draft dated March 10, 1913, for $2784.04, drawn by the Pemiscot County Bank on the Security Bank and Trust Company of Memphis, Tenn., to the order of defendant, the draft signed "A. C. Tindle, Cashier," and this draft was in due course paid through the mail by the Memphis Bank. At the time that defendant received Tindle's check for $2784.04, it held negotiable notes belonging to him and others, in an amount of about $9000, which it retained as security for the payment of Tindle's check, and when it received the draft from the Pemiscot County Bank in payment of this check, and received payment of that draft from the Memphis Bank, it surrendered these notes thus held as collateral. The testimony showed that this draft for $2784.04, although signed by Tindle, so far as the written portion thereof was concerned, was in the handwriting of a clerk in the Pemiscot County Bank.

It further appeared that the checks given by Tindle to defendant on the Pemiscot County Bank and cashed by that bank, as above stated, were found among the papers of the Pemiscot County Bank after it had closed its doors in June, 1913, but that these checks had never been entered on the books of the bank, and were never returned to the Tower Grove Bank. It does not appear that the notes were ever tendered or returned. F. J. Cunningham testified that shortly before the institution of this suit in 1914, as president of the Citizens Trust Company, he made demand of defendant for the amount of money represented by the two drafts sued on and at that time tendered these checks to defendant. This latter was denied. It further appeared that it was the custom of Tindle, as cashier of the bank, for a number of years preceding these transactions, to issue drafts in payment of his personal checks, and to pay his personal checks in cash when the same were presented at the bank for payment.

Tindle resigned as cashier of the Pemiscot County Bank, May 8, 1913, and shortly thereafter the bank closed its doors and entered into an agreement with Cunningham, or plaintiff Citizens Trust Company, appointing the latter its liquidating agent.

The testimony showed that during 1912 and 1913, Tindle was engaged in numerous business enterprises in and about Caruthersville, where the plaintiffs were located; that he carried on businesses in the names of corporations and as partnerships and financed these enterprises through the Pemiscot County Bank, issuing his checks on that bank when occasion required, and that this was known to the officers of the plaintiff bank. It also appeared that at the time the bank ceased to do business, the indebtedness of Tindle personally, and of these business concerns with which he was connected to the Pemiscot County Bank, aggregated over $400,000. Tindle was subsequently convicted of having embezzled funds of the bank while still in the bank, though after his resignation as cashier. After having served a portion of his time in the penitentiary he was paroled. He was also indicted for having received deposits in the bank, knowing the same to be in failing condition.

A statement of the financial condition of the Pemiscot County Bank, made by the State Bank Examiner, October 22, 1912, showing the bank to have been in an absolutely solvent condition, at that time, was introduced in evidence; subsequent investigation, however, showed that the bank was insolvent. The minutes of a number of meetings of the board of directors of the bank during the period from October 26, 1912, to May 13, 1913, were in evidence. None of them show more than a very cursory examination of the affairs of the bank, generally a mere passing on proposed discounts.

After Tindle resigned as cashier of the Pemiscot County Bank, and on or about May 15, 1913, he assigned and transferred to Cunningham, then president of the Pemiscot County Bank, as trustee of that bank, numerous life insurance policies, certificates of stock

in a number of corporations and a promissory note of a third party for $250, which Cunningham, in writing, agreed to hold in trust as security for any indebtedness due from Tindle to the bank and upon payment of the indebtedness the property, or so much thereof as remained in the trustee's hands undisposed of, was to be returned to Tindle. On the same day Tindle and his wife conveyed to Cunningham, by absolute deed in fee, numerous parcels of real estate belonging to them, and on the same date Cunningham, as trustee for the Pemiscot County Bank, entered into a written agreement with Tindle, wherein it is recited that Tindle had conveyed to Cunningham, as trustee for the Pemiscot County Bank, certain real estate for the purpose of giving the bank additional security for all direct indebtedness of Tindle, "now due said Pemiscot County Bank, and now estimated to be an amount not exceeding $75,000" and it was agreed that Tindle should at once begin arrangements for the payment of all his indebtedness and on its payment, Cunningham is to reconvey to Tindle all the real estate conveyed. There was also an agreement under which Tindle was to collect rents and remain in occupancy of the premises for a term. Thereafter, on May 30th, Tindle and his wife executed another deed to Cunningham, as Trustee for the Pemiscot County Bank, conveying additional parcels of real estate, some of them the individual property of Tindle's wife, and while this was absolute on its face it was made subject to the terms of the agreement of May 15th. In July, 1913, Tindle and Cunningham entered into an agreement referring to the one of May 15th, that that contract "is by mutual consent and upon the consideration of $1. and other considerations paid by A. C. Tindle, receipt of which is hereby acknowledged," fully cancelled, and the property turned over to Cunningham, as trustee, absolutely, except that Tindle is to have the use and occupancy of his home property for the period of 12 months free from rent. Tindle testified that the "other considerations" men-

tioned in the agreement last referred to was the agreement then and there made between him and Cunningham, as president of the Pemiscot County Bank and representing the Trust Company, that the execution of this written agreement was in full and complete satisfaction of all of Tindle's direct and indirect indebtedness to the bank. Cunningham denied any such agreement but asked to explain what the "other considerations" referred to were, made no explanation.

Tindle testified that the annual rental of the real estate he and his wife conveyed was $9000, and that he surrendered possession of all of it covered by the deeds of May 15th and 30th, except his homestead immediately upon the execution of the agreement of July 12th; that he had never received any statement showing the amount of his indebtedness to the bank, nor had plaintiffs ever accounted to him in any way for the rents or proceeds of the sale of the property conveyed by him and his wife to Cunningham. The real estate belonging to his wife was included in the deed to Cunningham, Tindle testified was worth $15,000 but no value was at any time fixed or agreed upon between him and Cunningham, and that neither of the plaintiffs had ever made any demand upon him on account of the alleged claim of the Pemiscot County Bank against them. Cunningham testified that he had sold the larger portion of the real estate conveyed to him by Tindle and his wife, realizing $37,000 in cash and $32,000 in promissory notes, and had turned the cash over to the Citizens Trust Company, plaintiff, to apply on Tindle's indebtedness to the Pemiscot County Bank.

At the conclusion of the evidence in chief for plaintiff and again at the conclusion of all the evidence, defendant interposed demurrers which were overruled.

At the conclusion of the trial, May 3rd, defendant asked that the court make a statement of its finding of facts and conclusions of law separately, under the provisions of section 1972, Revised Statutes 1909. Taking the case under advisement on May 3rd, the

court, on September 17, 1917, filed its finding of facts and rendered judgment for plaintiff on the first count of the petition for $2784.04, with interest at six per cent. from March 11, 1913, and in favor of plaintiff on the second count for $1780.44, with interest at six per cent. from December 26, 1912, the court deducting from the draft for $3060.88, the amount of Johnson's check for $1280.44. Motions for new trial were filed by the respective parties and overruled and each party having appealed, the appeals were heard by us together.

## OPINION.

REYNOLDS, P. J. (after stating the facts as above). —Taking up the draft for $2784.04 and the action of the court in rendering judgment for the full amount of that, we think that the learned trial court was in error. The check given by Tindle for the draft went by mail from the defendant bank to the Pemiscot County Bank, with the request that it be paid. In return the Pemiscot County Bank transmitted by mail to the defendant bank the draft drawn on the Security Bank and Trust Company of Memphis, Tennessee. By mail the Pemiscot County Bank transmitted that draft to the Memphis Company and it was duly paid. We can look on this transaction in no other light than as a transaction between the banks and it does not come within the rule relating to the issue of checks or drafts by a cashier in payment of his personal indebtedness. This personal indebtedness evidenced by notes, the notes secured by collateral worth something like $9000, it is true was a transaction in the name of Tindle but it represented notes of other persons that he had put up and which he had discounted when he obtained this money. While plaintiffs allege that the defendant never gave or paid to plaintiff or either of them anything of value or any valuable consideration for the draft, it had Tindle's check and the notes of various parties, discounted, it is true, by Tindle, and Tindle gave his check on the Pemiscot County Bank for that amount, which the

defendant bank sent by mail to the Pemiscot County Bank. When in payment of that check the draft was transmitted by mail by the Pemiscot County Bank to the defendant bank, and was transmitted by the latter to the Memphis Trust Company, on which it was drawn, and paid by the latter, the defendant, also by mail, surrendered the collateral which it held. All this was a matter in due course of business between two banks.

In Campbell v. Manufacturers National Bank, 67 N. J. L. 301, 1. c. 303, it is held:

"To make the acts of the cashier valid (in issuing a draft), the transaction in which the draft is delivered must be a bank transaction, made by the cashier, within his express or implied authority, in the conduct of the business of the bank. So long as a person deals with the cashier in a matter wherein, as between himself and the cashier, he is dealing with, or has a right to believe he is dealing with, the bank, the transaction is obligatory upon the bank.

"The cashier is presumed to have all the authority he exercises in dealing with executive functions legally within the powers of the bank itself or which are usually or customarily done, or held out to be done, by such an officer.

"But the test of the transaction is whether it is with the bank and its business, or with the cashier personally and in his business (citing cases).

"As to the former, all presumptions are in favor of its regularity and binding force."

This case is cited with approval by our Supreme Court in St. Charles Savings Bank v. Edwards, 243 Mo. 553, 1. c. 567, 147 S. W. 978.

There was nothing in this transaction with respect to that draft, beyond the fact that it was drawn in payment of the cashier's secured obligations, that can in any way carry notice or knowledge to the defendant bank that it was other than a regular bank transaction. While a principle announced as in the Edwards Case and others of like character, may be entirely correct, in

its application we must not lose sight of the facts to which it is to be applied, as said by our Supreme Court in Bender v. Weber, 250 Mo. 551, l. c. 561, 157 S. W. 570: "In the next place, a good rule, of every day service, is that judgment of appellate courts on one state of facts may not be applied automatically to another state of facts, but, *contra,* the general language in decision must be read in the dry light of the very case held in judgment, and not otherwise. [State ex rel. v. St. Louis, 241 Mo. l. c. 238, et seq.]" [See 145 S. W. 801.] The latter case cited by Judge LAMM, is very full on the same proposition. The case at bar has none of the elements which appear in the Edwards case, supra, St. Charles Savings Bank v. Orthwein Investment Co., 160 Mo. App. 369, 140 S. W. 921, and some other cases relied on, where the person collecting on the cashier's draft knew that the cashier was speculating in the market on his own account, and that they were his individual transactions in which a bank could not possibly be legally interested. The two cases cited were essentially cases where it appeared that the cashier had been speculating, gambling on the market. In the case at bar, however, so far as anything appears, regular commercial paper was discounted at the defendant bank by Tindle and the money paid over to him. When it became due he gave, first, his own check on his own bank then as cashier and in the ordinary course of business, issued this draft on another bank in favor of the defendant bank for the amount. This is entirely unlike the cases referred to, and in our judgment makes it a bank transaction between two banks. The check Tindle gave for the notes he had put up, for which the defendant bank held collateral, was on his own bank, it is true; but that fact in itself and under the circumstances in this case carried no notice of any irregularity about it. [St. Charles Savings Bank v. Edwards, supra.] It would be a curious proposition if the cashier of a bank did not have his own funds in his own bank. There must be something more than the mere fact that he drew

his check on his own bank to make that check void. Here the cashier drew his own check on his own account in his own bank, in connection with a transaction that so far as defendant bank could know or was charged with knowledge, was entirely regular. This is particularly so where the defendant bank held collateral for the debt which the check was intended to pay. There was nothing in it, under the facts here present, to carry any notice to the defendant bank of any irregularity in it. So that we think the trial court was clearly wrong in rendering a judgment against the defendant bank on that draft.

With reference to the draft for $3060.88, we are compelled to hold that the learned trial court was in error in finding against defendant on that draft for any amount. The defendant bank had in its hands notes to which Tindle was only indirectly responsible by being a member of the firm to whose order they were issued and for whose benefit they were discounted. It is true that Tindle was a member of that firm, but he had two other partners and there was nothing irregular whatever in that concern—a partnership—putting up its notes, having them discounted by the bank, and if it allowed Tindle to receive the proceeds of the discount, the defendant bank was not concerned. The fact that the proceeds of the discount were paid to Tindle is of no substantial import. It was a regular business transaction, conducted in the ordinary and usual way and there was nothing whatever in it to convey or intimate in any way to the defendant bank that Tindle, when he discounted these notes for his concern, was dealing on his personal account any further than he was also a member of that firm. It is rather curious to note that the learned trial court did, in a measure, recognize this draft as valid, for it refused to hold defendant for all of it. When these notes of the Concord Mercantile Company, which had been discounted for it by Tindle, were about to fall due, Tindle wrote to the defendant bank asking that they be sent down to Caruthersville for collection. Defendant bank sent them, not to Tindle's bank but to

another bank at Caruthersville. Not receiving payment for them, its president went to Caruthersville, took the notes from the bank to which they had been sent and, in the ordinary course of business, presented them at the Pemiscot County Bank in its banking house, the bank open for business; presented them, not to Tindle personally, as it appears, but to an assistant cashier there. There being a question between Tindle and his partners in the Concord Mercantile Company as to who should adjust and pay off this indebtedness, Mr. Schmoll saw all of them. The partners arranged it among themselves, so that one of them gave his check on another local bank for his proportion of it, less $500, which he had before then paid over to Tindle, on Tindle agreeing to make that good. Tindle thereupon gave his check for this $500, and also for $1280.44, his proportion of the indebtedness evidenced by his company's notes, and the other partner, Johnson, gave his check for $1280.44, his proportion. How it is possible to arrive at a conclusion on this state of facts, that there was anything unusual about this transaction, or anything calculated to put the defendant bank on notice that Tindle was improperly using the funds of the bank in payment of his own indebtedness, does not seem to us to follow from the transaction. It was in evidence that Tindle had frequently overdrawn his account, and evidence to the effect that he had done so with the knowledge of his fellow directors and officers of the bank. It was in evidence that about the time he issued these checks, which were taken up and absorbed by the draft, they could have been met by deposits which he had subsequently made in the bank to his own account. So that the Pemiscot County Bank had funds of his on hand, according to this evidence and as shown by its books, with which these drafts could have been paid. The fact that it afterwards developed that Tindle was indebted to the bank in a large amount, does not do away with the fact that at or about the time when he made his checks and this draft, he had ample funds out of which to pay them

deposited in the Pemiscot County Bank. That he had made such deposits is not contradicted.

The evidence further shows that for years Tindle had been the sole manager of the concerns of this bank. As far as the minutes introduced in evidence show, the attention of the other directors of the bank and of its officers to the affairs of the bank, was of the most casual, perfunctory character. They left everthing to him; they knew that he had overdrawn at different times; they knew he had been in the habit of issuing checks on his bank in payment of his own indebtedness and using the bank's draft on them. So that our conclusion is that the learned trial court fell into error in awarding any judgment on this draft for $3060.88 against the defendant. The learned trial court was entirely right in excluding from the judgment the amount of the Johnson check. That much of his action is approved. His action in awarding any judgment against defendant on either of these drafts, is disapproved.

We have not here noticed the transfers of property by Tindle and his wife to Cunningham for the Pemiscot County Bank. Nor did the learned trial court in any manner cover this feature of the case in his statement of facts, was a material and constitutive issue.

A finding of facts which does not embrace all the constitutive facts is open to attack in the appellate court. [Fahy v. Springfield Grocer Co., 57 Mo. App. 73.] All the constitutive facts, separately from the conclusions of law, must be stated so that exceptions may be saved thereto. [Cochran v. Thomas, 131 Mo. 258, 33 S. W. 6.] Among the points made in the motion for a new trial and on the assignments made by counsel before us this point is covered. Counsel for the appellant Tower Grove Bank also specifically complain that there was nothing but a general judgment here and no judgment such as required by the statute.

In Cochran v. Thomas, supra, it is said (l. c. 268): "We are of the opinion that under this provision (referring to the section above cited) the court is required

to find and state in writing, not only every constitutive fact in issue to which his attention is directed, but also separately the conclusions of law thereon in order that exceptions may be taken thereto.''

It is true that in the case at bar no declarations of law were asked or given, and in the Cochran Case our Supreme Court holds that failing to make such request a general finding for one party is equivalent to a declaration of law that upon all facts found such party is entitled to recover is sufficient to support the judgment. But the case at bar goes further. Here there is no distinct finding of many of the constitutire facts in the case, and for that reason we think the finding of facts is insufficient and would warrant a reversal of the judgment and a remander of the cause.

Our own view of it is, that the defendant bank was certainly entitled to participate in the amount realized on these properties and the trial court should have found one way or the other on this.

The point is made and very strongly argued before us, that as this case was determined by the trial court September 17, 1917, when the Act of April 17, 1917, was in effect, namely, June 18, 1917, (Laws 1917, p. 143), that this case should have been determined by the trial court and should be determined by us in the light of that act. We do not consider it necessary to pass on that phase of the case. If the judgment was reversed and the cause remanded on a new trial and a new trial had, the question might come up as to the effect on this action of that act. On this we express no opinion.

The action of the circuit court in rendering any judgment against defendant on either cause of action is reversed and the cause remanded with directions to enter up judgment for the defendant on both counts of the petition. *Allen* and *Becker, JJ.,* concur.