## CITIZENS' TRUST CO. v. CROLL et al.

(Circuit Court of Appeals, Seventh Circuit. March 29, 1923.)

No. 3178.

1. **Trial ☞404(2)—Finding cashier was authorized to sign draft for payment of personal obligation held not a conclusion of law.**

In an action by the receiver of an insolvent bank to recover the amount received by defendants on a draft signed by the cashier of the bank and given in payment of his personal obligation, a finding by the trial court that the evidence showed the cashier had authority to sign the draft in question was a finding of fact and not a conclusion of law, and without such finding the controverted issues could not have been disposed of, so that the judgment for defendants must be sustained, if that finding was supported by evidence.

2. **Banks and banking ☞102—Authority of cashier to act for bank may be shown by long-pursued course of conduct.**

The authority of a cashier to act for the bank may be shown by express grant, or by implication from a course of conduct covering a considerable period and acquiesced in by the other officials of the bank, and such authority implied from conduct need not rest on estoppel.

3. **Banks and banking ☞118—Evidence held to sustain finding cashier was authorized to sign draft on bank funds for personal obligation.**

Evidence that the cashier and president of a bank had both signed drafts on the bank funds in payment of their personal obligations, and that their conduct had been ratified and sanctioned by the directors, and that after the death of the president the cashier practically ran the bank with the consent of the directors, *held* sufficient to sustain a finding that the cashier was authorized to sign the draft in controversy, which was issued for his personal obligation to defendants.

4. **Banks and banking ☞113—Directors held estopped to question authority of cashier to sign draft for personal obligation.**

Where directors had previously ratified the conduct of the cashier of a bank in signing drafts on its funds for payment of his personal obligations, they are estopped to say that a similar transaction, secretly and in concealment conducted by him, does not bind the bank.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Action at law by the Citizens' Trust Company, as receiver of the Pemiscot County Bank, against Frederick W. Croll and another. Judgment for defendants, and plaintiff brings error. Affirmed.

Francis M. Lowes, of Chicago, Ill., for plaintiff in error.

A. F. Reichmann, of Chicago, Ill., for defendant in error.

Before BAKER and EVANS, Circuit Judges, and WILKERSON, District Judge.

EVAN A. EVANS, Circuit Judge. Plaintiff brought this action to recover $20,000 and interest, alleged to have been paid defendants for stock purchased by one Tindle, cashier of the defunct Pemiscot County Bank, out of funds of such bank. A jury was waived and the trial judge made findings of fact, which fully cover the issues presented by the pleadings. We quote therefrom:

"(1) The Pemiscot County Bank, of Caruthersville, Mo., was a corporation organized under the laws of the state of Missouri as early as 1907. The secretary's record book does not disclose any by-laws and none are introduced in evidence. As far back as the records show, A. O. Tindle, S. B. Reynolds, F. J. Cunningham, and H. C. Schultz were directors up to and after the happening of the matter here in controversy. William A. Ward was the fifth director and president up to the time of his death, March 25, 1912, at which time J. A. Cunningham, a brother of F. J. Cunningham, was elected a director and president, and there was no change up to the time of the happening of the matters in question, or until Tindle tendered his resignation in May, 1913. Tindle, who was the largest stockholder and related to the Cunninghams by marriage, was always the cashier, and up to the time of Ward's death he and Ward had almost exclusive management and control of the bank.

"(2) With the exception that E. C. Tindle, in 1910, offered the following resolution, which was adopted by the directors: 'That on all loans of $2,000 or over, cashier or president shall advise with at least one other director before making such loan'—and again in 1911 Tindle moved that 'on all applications for loans from the bank of $2,000 or more the president or cashier shall advise with at least two other directors before granting said loan,' which was adopted by the directors, there was no provision, by resolution or otherwise, shown in the record of any limitation upon the right of either the president or the cashier to make loans to themselves or to anybody else, and, while it appears that many loans were in the bank continuously in excess of $2,000, not only to most, if not all, of the directors, but to others, there is almost an utter absence of any record of applications for loans to the board. There is no record of evidence that Tindle or the president complied with the resolution, but the record does frequently show the following entry: 'All loans were examined and approved.'

"(3) It appears that frequent complaints were made by the banking department of the state of Missouri that there were excessive loans to the directors or to concerns in which they were interested.

"(4) There was no provision in the by-laws or any other record appearing in the bank, or appearing from testimony, authorizing or regulating the issuance of drafts upon the bank's depositories in the course of its business, and the authority to issue drafts must be determined wholly from the course of practice, which always was during the life of William A. Ward, as follows: William A. Ward and Tindle severally drew drafts for every purpose, as occasion arose, and the evidence shows that each of them actually drew drafts upon correspondent banks in payment of their respective individual debts.

"(5) The evidence shows that Ward and Tindle, particularly Tindle, was, to the knowledge of the other directors of the bank, engaged in many business concerns which were borrowers in large amounts from the bank, and shows that Tindle and Ward and those concerns did all of the business through the bank.

"(6) The evidence shows that many of those things were actually known to the other directors, and that many others ought to have been known, and whether they were actually so known does not appear.

"(7) The evidence shows that the directors and officers of the bank, after the death of Ward, left the conduct and management of the bank solely to Tindle, and that they relied upon him to such an extent that, although on several occasions glaring irregularities were disclosed which apparently involved Tindle, yet, with one exception, the president and directors merely asked Tindle about the matter and accepted his statement without going to the books or records or causing any investigation. The exception above referred to was where the state auditor's published report showed that there was a discrepancy as to the condition in the county treasurer's office, and the county treasurer's report showed $2,000 more deposited in the bank than the bank's books showed were on deposit. The president, Cunningham, and Director Reynolds, went to the depositors' ledger, which disclosed the discrepancy, but under Tindle's showing them what they now say was a forged passbook, which Tindle said belonged to the county treasurer, they pursued the matter no further, notwithstanding the fact that the county treasurer's office was within

four blocks of there. It appears the shortage actually existed. The above is merely illustrative of the confidence of the directors in Tindle. The evidence shows many instances in which matters of complaint were brought to the attention of the directors and treated in the same manner.

"(8) The evidence shows that the defendant Croll had under a written agreement purchased from Tindle several manufacturing concerns owned or controlled by Tindle, and that under the agreement the purchase price of $90,000 was to be deposited in the Pemiscot County Bank and held by it to pay liabilities outstanding against these concerns. The excess, if any, after the liabilities were paid, were to be paid to or for the account of Tindle, as he might direct. The evidence also shows that Croll had reason to believe that the liabilities to be paid out of that money were not in excess of $65,000, and that there would be in the bank, ultimately, $30,000 or $35,000, to be paid to Tindle; $90,000 was paid by Croll in drafts, which went to the credit of the Pemiscot County Bank in the National Bank of Commerce, in St. Louis, Mo. The drafts were dated July 11th, and all were deposited to the account of the Pemiscot County Bank in the Missouri bank on or about August 9, 1912. Under the contract of sale from Tindle to Croll, Tindle had the right to purchase from Croll $20,000 worth of the capital stock of the Caruthersville Oil Mill Company, and on August 24, 1912, Tindle, as cashier, writing in the name of the Pemiscot County Bank, asked to have that stock sent to the bank. The stock was sent, and in payment for it Tindle, as cashier, issued a draft of the Pemiscot County Bank on the said National Bank of Commerce of St. Louis for $25,000 to Croll, which draft was paid by the National Bank of Commerce and charged, under its proper number and date of payment, in the report of the National Bank of Commerce of September, 1912, between it and the Pemiscot County Bank, which report was sent to the Pemiscot County Bank in due course. It appears that the draft was not regularly entered by Tindle upon the bank's register by its proper number, but whether it at all appeared upon the books of that bank I am unable to determine from the evidence. * * *

"(12) The evidence shows that Tindle had authority to sign the draft in question."

Contending that finding No. 12 is a conclusion of law and not a finding of fact, and further that it is unsupported by the evidence, plaintiff in error attacks the judgment that issued on pronouncement of the findings.

[1] Our examination of the issues and the evidence convince us that the court intended to cover this determinative issue of fact by a finding. It is true that such an issue may, under certain circumstances and in certain cases, be called a conclusion of law. It may also, under other circumstances, be a mixed question of fact and conclusion of law. But here it was an issue of fact. Was Tindle, notwithstanding he was cashier of the bank, authorized to issue bank drafts to pay his personal obligations? This was the decisive issue of fact, and the trial judge could not have completely disposed of the controverted issues without passing squarely on this particular issue. If the finding be sustained by the evidence, then judgment for the defendant was unescapable.

[2] Authority to act for the bank may be by express grant, or by way of implication from a course of conduct covering a considerable period, acquiesced in by the officials of the bank. 3 R. C. L. 444; Martin v. Webb, 110 U. S. 7, 3 Sup. Ct. 428, 28 L. Ed. 49; Campbell v. National Broadway Bank, 130 Fed. 699, 65 C. C. A. 664; Campbell v. Manufacturing National Bank, 67 N. J. Law, 301, 51 Atl. 497, 91 Am. St. Rep. 438; Pemiscot County Bank v. Tower Grove Bank, 204 Mo.

App. 441, 223 S. W. 115; Dierkes v. Hauxhurst Land Co., 80 N. J. Law, 369, 79 Atl. 361, 34 L. R. A. (N. S.) 693; Wing v. Commercial Bank, 103 Mich. 565, 61 N. W. 1013; Davenport v. Stone, 104 Mich. 521, 62 N. W. 723, 53 Am. St. Rep. 467. It is not necessary to rest this statement on the theory of an estoppel, for the authority of an agent or of an officer depends upon the action of the principal, and this action may be expressed by carefully prepared resolution, by express contract, or it may be evidenced by a long-pursued course of conduct.

[3] In the "one-man" bank, where the cashier performs the usual duties of that office, and in addition thereto the duties of president, teller, bookkeeper and board of directors, constantly for several years, and in the performance of these duties issues and signs drafts for the bank in payment of his personal obligations, and his entire conduct is ratified and sanctioned by directors, there exists ample support for a finding such as was made in this case. We are by no means commending such a practice. It should be condemned. But we are dealing with a case where directors failed to direct, where they surrendered their powers to the cashier, and in a case where the bank, after insolvency, is endeavoring to recover from a third party, who dealt innocently and in good faith with the bank. In such a case it is not the innocent third party, but rather the directors, who should suffer.

[4] Moreover, the officers are estopped under these circumstances to assert the nonauthority of their cashier. As stated in 3 R. C. L. 447:

"But if the bank gives its cashier authority to draw drafts for his own account on its funds, or ratifies his acts in known transactions which he openly conducts, honestly or dishonestly, it is estopped to say that a similar transaction, secretly and in concealment conducted by him, does not bind it."

Not only is there evidence to support the finding but we cannot see how any other finding could be sustained.

It is not necessary to consider the other grounds advanced by defendant in support of the judgment.

The judgment is affirmed.