SECURITY BANK & TRUST CO. v. FOS-
TER et al. ' (No. 1394.)*

(Court of Civil Appeals of Texas. El Paso.
Jan. 25, 1923. Rehearing Denied
March 8, 1923.)

1. Bills and notes ⬅️155—Demand note not
nonnegotiable because of acceleration clause.

The. negotiable character of a demand note
is not destroyed by provision that the holder
can declare it due at any time if for any real
or imaginary cause it deems itself insecure.

2. Bills and notes ⬅️166—Provision as to fur-
nishing additional security does not render
note nonnegotiable.

Under Neg. Inst. Law, §§ 1, 5, 184 (Ver-
non's Ann. Civ. St. Supp. 1922, arts. 6001—1,
6001—5, 6001—184), a provision requiring the
furnishing of additional collateral at the hold-
er's option held not to render a note nonnego-
tiable as requiring the performance of an act in
addition to the payment of money.

3. Bills and notes ⬅️157—Provision as to sale
of securities to secure payment of other in-
debtedness of maker did not render note non-
negotiable.

Provisions of note authorizing sale of pledg-
ed securities to secure the payment of any oth-
er indebtedness of the maker held not to de-
stroy its negotiable quality as making the
amount of the obligation uncertain.

4. Bills and notes ⬅️113, 338—Payee may be
"holder in due course;" payee of note held
protected by doctrine of estoppel against
makers' claim of fraud.

The payee of a note was a holder in due
course thereof, having received and accepted
the same from the negotiator for value and
without notice of his fraud and of agreement
between him and makers that before delivery
additions would be made to their signatures so
as to make the note the obligation of the bank
of which they were directors, and, in any event,
the note being negotiable and having been re-
ceived in the ordinary course of business, the
payee was protected under the doctrine of es-
toppel.

[Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Holder
in Due Course.]

5. Bills and notes ⬅️92(5)—Bank directors'
note given for bank's debt held supported by
consideration.

Where defendant bank, holding the matured
note of the L. bank, was unwilling to renew it,
but was willing to accept the personal obliga-
tion of the directors of the L. bank in settle-
ment, and, on receiving the note of such direc-
tors, surrendered the note of the L. bank, can-
celed its indebtedness, and released a large
amount of collateral, the directors' note was
supported by a consideration.

6. Principal and agent ⬅️14(3)—Officer of
debtor bank held not creditor's agent in pro-
curing note of directors of bank in settle-
ment of bank's note.

Where creditor, being unwilling to renew
bank's note, accepted in settlement thereof the
note of such bank's directors, they could not
defend against liability on their note on the
ground that the bank's cashier, in procuring
their note, was the agent of the creditor, as re-
spects the latter's liability for the representa-
tions of such agent.

7. Pledges ⬅️31(1)—Pledgee's acceptance of
renewals of collateral notes without pledgor's
consent constituted conversion.

Where pledgee, without authority from
pledgors, accepted renewals of some of the col-
lateral notes held by it, this constituted a con-
version of such notes as of the renewal dates.

Appeal from District Court, El Paso Coun-
ty; Ballard Coldwell, Judge.

Suit by Samuel A. Foster and others
against the Security Bank & Trust Company.
From judgment for named plaintiff and cer-
tain other plaintiffs, defendant appeals. Re-
versed and rendered.

Winter, McBroom & Scott, of El Paso, for
appellant.

Burges & Burges, of El Paso, and Stratton
& Lynch, of Clifton, Ariz., for appellees.

Statement of Case.

HIGGINS, J. This suit was brought in
the district court of El Paso county by
Samuel A. Foster, C. P. Austin, James Ed-
gar, W. H. Graham, B. S. Jackson, and J.
A. Leahy against the Security Bank & Trust
Company, to cancel a note executed by plain-
tiffs and one D. L. Hill in the principal sum
of $43,931.90, dated February 14, 1921, pay-
able on demand to order of said bank, and
to enjoin the sale of certain collateral held
by the bank as security. Subsequently, and
by agreement, the collateral was sold and
its proceeds applied on the note. The bank
set up several defenses to the suit, and by
cross-action sought to recover of plaintiffs
and Hill the amount of the note with inter-
est and attorney's fees. Judgment was ren-
dered in favor of the plaintiffs, Foster, Aus-
tin, Edgar, Jackson, and Graham canceling
the note as to them and in favor of the bank
against Hill and the plaintiff Leahy for $38,-
018.90, due as principal and interest upon
the note, and the further sum of $4,781.89 as
attorney's fees. The bank appeals, and com-
plains of the judgment rendered in favor of
Foster, Austin, Edgar, Jackson, and Graham.
Hill and Leahy do not appeal. The facts out
of which the litigation arose are as follows:

The Security Bank & Trust Company and
the Lordsburg State Bank were banking cor-
porations, the former engaged in business at
El Paso Tex., the latter at Lordsburg, N.
M. L. J. Gilchrist and C. L. Ezell were
vice presidents and active managing officers
of the Security Bank. The makers of the
note in question were directors of the Lords-
burg Bank. Hill was also cashier, and sub-
sequently president, of the latter bank;

---

Leahy was vice president thereof. Hill was the active managing officer of the Lordsburg Bank, and the other officers and directors seem to have had implicit confidence in him, and, according to their testimony (except Leahy, who did not testify), they knew nothing about the details of the bank's business or its actual financial condition.

On December 23d, 1920, the Security Bank loaned to the Lordsburg Bank the sum of $50,000 taking its demand note therefor, and at the same time acquired certain rediscounts for the latter bank. When this was done the Security Bank was furnished with what purported to be a copy of a resolution adopted by the board of directors of the Lordsburg Bank on December 20, 1920, authorizing its president, vice president, and cashier, or either of them, on behalf of said bank, unlimited authority to borrow money from the Security Bank, and to execute the proper obligations therefor, and pledge bonds, stocks, bills receivable, or other securities or property securing the money so borrowed, and also authorizing them to rediscount any of its bills payable with the Security Bank. This copy was certified to be a true extract from the minutes of a meeting of the board of directors held on December 20, 1920, the certificate being signed by Leahy as vice president, and attested by Hill as cashier under the seal of the bank.

In the early part of February, 1921, the principal of the note had been reduced by payment to about $43,000, but in the meantime an indebtedness upon overdraft had been created in the sum of about $10,400. The Security Bank was demanding payment of the balance due upon the note and the overdraft, and the Lordsburg Bank had failed to make payment. To secure the payment of this indebtedness the Lordsburg Bank had pledged bills payable owned by it in the aggregate sum of about $71,000 or $72,000. Shortly prior to February 7, 1921, Gilchrist went to Lordsburg to look after the loan, and found that the Lordsburg Bank was needing money badly. While there he conferred with Hill and Leahy with reference to the indebtedness, and Leahy stated that he was willing to pledge his own credit in behalf of the Lordsburg Bank. Gilchrist did not confer with the other directors. Shortly thereafter, and evidently for the purpose of settling the indebtedness and securing additional credit for the Lordsburg Bank, Hill sent to the Security Bank seven notes aggregating $80,000, each note purporting to be signed by one director and indorsed by the other directors. Accompanying each note was a draft purporting to be signed by the maker of the note and for the amount of his note. These drafts were drawn upon the Security Bank in favor of the Lordsburg Bank, and in the accompanying letter of Hill he requested the Security Bank to accept the notes and drafts and credit the proceeds to the Lordsburg Bank. The Security Bank refused to do so, and returned the same. Thereupon Gilchrist wrote Hill the following letter:

"El Paso, Tex., Feb. 7, 1921.

"Mr. D. L. Hill, Cashier, Lordsburg State Bank, Lordsburg, N. M.—Dear Lafe: Referring to our recent conversation regarding notes held by us from your bank, we have decided the best way of handling for yourselves and ourselves is as follows: We to take the personal note of your seven directors in amount of say $50,000, running for a period of ninety days or such a matter, during which time no doubt considerable of your paper could be liquidated. As security to their personal note, your bank to sell them as individuals, a like amount of paper which we are now carrying, they to select the paper they desire to use as collateral to their indebtedness, and by which they would be secured against loss personally. On the notes sold and attached to their note as collateral, the indorsement of the Lordsburg State Bank would be made without recourse and would not, therefore, be a liability on the part of the bank. This would enable you to reduce your liability as now shown. The paper held as collateral to this indebtedness would be liquidated by us as rapidly as possible for account of the owners. Payment as made on the collateral notes would be applied on the personal note of your directors. This, I believe is the best and proper method of handling and I trust will meet with your approval. I am inclosing a collateral form note filled in for $50,000, which if agreeable have signed by your seven directors including yourself returning it to me with list of notes you sell from the bank to them as security to the note, and we will immediately make transfer in this manner. In order to make this sale of notes legal, I suggest you have your board of directors authorize the sale by resolution, same to appear in your minute book that there may be no question hereafter regarding the owners of this paper. I advise that you do this as soon as possible. Under separate cover I am to-day forwarding you a bunch of notes for handling as collections as our account, with advice concerning same. Awaiting your reply in the matter and with best wishes, I am,

"Very truly yours,
    "L. J. Gilchrist, Vice President."

Accompanying this letter was the note in controversy. The note was prepared by J. H. Henderson, cashier of the Security Bank, who prepared the list of the collateral security, such collateral being selected by the Security Bank from the collateral then held by it. The note, with appellees' signatures thereto, was thereafter returned to the Security Bank by Hill with certified copy of a purported resolution of the board of directors of the Lordsburg Bank as follows:

"Lordsburg, N. M., Feb. 14th, 1921.

"At a special meeting of the board of directors held this date, a quorum being present, and J. A. Leahy, vice president, presiding. Upon motion duly made and seconded the cashier was authorized and instructed to sell bills receivable to B. S. Jackson, James Edgar, C. P.

Austin, W. H. Graham, Sam A. Foster, J. A. Leahy and D. L. Hill in the amount of forty three thousand nine hundred thirteen dollars and ninety cents ($43,913.90).

"There being no further business to come before the meeting, said meeting upon motion duly made and seconded was adjourned.

"J. A. Leahy, Vice President.

"Attest: D. L. Hill, Cashier.

"I, J. A. Leahy, vice president of the Lordsburg State Bank, Lordsburg, N. M., do hereby certify that the foregoing is a true and exact copy of the minutes of a meeting of the board of directors of the Lordsburg State Bank, Lordsburg, N. M. A quorum being present, held at Lordsburg, N. M., the 14th day of February, 1921. In witness whereof, I have hereunto set my hand and affixed the official seal of said bank this 14th day of February, 1921.

"J. A. Leahy, Vice President.

"Attest: D. L. Hill, Cashier.

"[Seal of the Lordsburg State Bank, Lordsburg, New Mexico.]"

Said note, with signatures thereto, reads:

"El Paso, Texas, Feb. 14, 1921.

"For value received on demand after date I or we promise to pay to the order of Security Bank & Trust Company, at its office in El Paso, Texas, forty three thousand nine hundred thirty-one and $90/100$ dollars with interest at the rate of 8 per centum per annum, from date until paid; interest payable annually, and defaulting interest to draw the same rate of interest as principal. Having deposited with the Security Bank & Trust Company as collateral security for the payment of this note or any renewal thereof and any other liability or liabilities of the undersigned to the said Security Bank & Trust Company, either as maker(s), or indorser(s), or guarantor(s), due or to become due, or which may hereafter be created, the securities or property below mentioned, the said Security Bank & Trust Company or any holder hereof is invested with a full authority to at any time use, transfer, hypothecate, and in the event of the nonpayment of this note or any other liability of the undersigned to the said Security Bank & Trust Company at maturity, sell and convey at public or private sale the securities or property hereby hypothecated or any accounts or property substituted therefor, or any part thereof, or cause the same to be done with or without notice or demand of any sort, at such time or place and upon such terms as the holder hereof may deem best, and the holder hereof is authorized to purchase said securities or property when so sold; proceeds of such sale shall be applied toward the payment of this note and to such other liabilities of the undersigned, to the said Security Bank & Trust Company whether as maker(s), indorser(s), or guarantor(s), due or to become due, together with all protests, damages, interest, cost and charges due upon this note (or) and any other such liabilities aforesaid or in the execution of this power, together with cost or collection, including attorney's fees, and the balance, if any, to the undersigned. It is understood and agreed that should there be any depreciation in the value of the securities or property hereby hypothecated or should the holder hereof at any time before or after maturity for good

or imaginary cause deem itself insecure, the said Security Bank & Trust Company is hereby authorized to immediately apply, as a credit hereon, any balance with it, standing at the credit of the maker hereof, (or) and such amount of additional security shall be furnished by the undersigned as will be satisfactory to the holder hereof, and should such additional security not be furnished within twenty-four hours after written or verbal demand so to do, then this note at the option of the holder, shall become immediately due and payable as though the whole time for which it was given had elapsed, and the holder hereof, its agents or assigns, is authorized to sell the said securities or property below mentioned or any securities or property substituted therefor or added thereto as above provided. It is also agreed that should default occur in the payment of this note or any other obligation to the said Security Bank & Trust Company upon which the undersigned is liable, as further security, the said Security Bank & Trust Company is hereby authorized to hold all other securities, money or property deposited with it, owned by or in which the undersigned is interested, and apply the same, or the proceeds thereof, to the payment of the obligations of the undersigned to the said Security Bank & Trust Company. Should other collateral or property be substituted in whole or in part for that mentioned below or should additional collateral or property be furnished, then such substituted (or) and added collateral or property shall be subject to the same terms and conditions of this note as if originally deposited and mentioned herein. The maker(s), indorser(s), (or) and guarantor(s) hereon hereby waive demand, notice, protest, diligence, or suit, and the Security Bank & Trust Company or other holder hereof is hereby released from any and all liability of every kind pertaining to the collection, or failure to collect, the above-mentioned collateral and all other collateral which the said Security Bank & Trust Company may, at any time, hold to secure this and all other obligations of the maker hereof to said Security Bank & Trust Company.

"Secured by notes as per list attached aggregating $43,931.90.

"No. 15620.

| | |
|---|---|
| "B. S. Jackson. | J. S. Leahy. |
| "D. L. Hill. | James Edgar. |
| "W. H. Graham. | C. P. Austin. |
| | "S. A. Foster. |

"Address, Lordsburg, N. M."

This note was accepted by the Security Bank in settlement of the balance due upon the note of the Lordsburg Bank of December 23, 1920, which latter note was canceled and surrendered. At the same time the Security Bank released all of the collateral which it held except the collateral notes mentioned in the memo attached to the note of February 14, 1921, and except collateral amounting in the aggregate to about the amount still due upon overdraft. The collateral so released was about $22,000 or $23,000. The release of such collateral was made for the purpose of enabling the Lordsburg Bank to add other collateral thereto and obtain a loan from some other source. To the re-

leased collateral Hill did add other collateral, and upon the same obtained for the Lordsburg Bank a loan of $35,000 from another El Paso Bank. Shortly after the acceptance by the Security Bank of the note of February 14, 1921, the overdraft was paid by the Lordsburg Bank, and upon its payment the Security Bank surrendered the collateral which it had retained to secure the overdraft, retaining, however, the collateral attached to the note of February 14th.

On July 6th, Gilchrist wrote to each of the signers of the note in controversy a letter which reads:

"Dear sir: Under date of Feb. 14, 1921, you with other individuals, all directors of the Lordsburg State Bank, Lordsburg, N. M., gave to us your individual notes, payable on demand, and in the amount of $43,931.90, which note was secured by various notes purchased by you and others from the Lordsburg State Bank in aggregate amount of $43,931. Since making of this note and by partial payments made on the collateral attached, your obligation is now in principal amount of $43,181.90, with interest at 8% per annum from Feb. 14, 1921. At time of accepting this note from you, it was with the understanding that payment in full of principal and accrued interest would be made not later than June 15, 1921. This not having been done, we now wish to advise you, as one of the makers on the note, that we desire payment of principal and accrued interest not later than July 20, 1921, and in the event payment is not made as of that date, we will of necessity have to hand the paper to our attorney for collection. We trust you with the other signers will arrange toward the end that payment of this indebtedness is made as demanded. We have already carried the note past the time understood it would be paid, and conditions are such that we must call on you with the other makers for payment.

"Very truly yours,
"L. J. Gilchrist, Vice President."

No reply to this letter was made by any of the signers. Some of the plaintiffs explained their failure to reply by saying that upon receipt of the letter they went to see Hill, who assured them that the matter had been, or would be, taken care of by the bank immediately. Shortly after the date of this letter the Lordsburg Bank failed.

On August 13, 1921, and after the failure of the bank, this suit was filed by the makers of the note, and to cancel same, and to restrain the sale of the collateral. The basis of the action and the defense interposed to the Security Bank's cross-action is that the note in controversy was presented to the makers by Hill for their signatures as officers of the Lordsburg Bank, and was signed by them upon the representation made by Hill and agreement by him that before delivery he would insert in typewriting the name of the Lordsburg State Bank above their signature, and add after their signatures the word "Director," so as to make the note the obligation of that bank, and thereby show that they were signing in their representative capacities, and not as personal obligors.

The testimony of the appellees, in substance, was that they knew nothing about the actual condition of the bank's affairs, such condition being known only to Hill, to whom they had delegated and who exercised full control and management, and in whom they had full confidence; that they did not know that in December, 1920, the Lordsburg Bank became indebted to the Security Bank in the sum of $50,000, as evidenced by the note of December 23, 1920; that at or shortly before the execution of the note in controversy Hill stated to them that it was the duty of the Lordsburg Bank to protect and finance its customers engaged in the cattle business, and who were in distress and needed financial assistance; that they agreed to this suggestion, and when they executed the note they thought it was for the bank to obtain money for that purpose; that they did not know the Lordsburg Bank was already largely indebted to the Security Bank, and that the note was executed in settlement of a then existing debt; that in signing same they did so upon the representation and agreement of Hill that before its delivery he would write with a typewriter the name of the Lordsburg State Bank above their signatures, and add "Director" after their signatures so as to show that they were signing in their representative capacities, and thereby make the note the obligation of the bank, and not their personal one; that there were no directors' meetings held at which resolutions were adopted, as shown by the certified copies of resolutions purporting to have been adopted on December 20, 1920, and February 14, 1921; that no such resolutions had ever been adopted, and the minute books showed none; that they knew nothing of any collateral having ever been transferred to them as authorized by the purported resolution of February 14; that they had not signed the personal notes and drafts aggregating $80,000 mentioned above; that in July, 1912, and just before the bank was closed by the state authorities, a directors' meeting was held at which a statement was presented by Hill showing the bank to be in excellent condition which they accepted as correct, and upon the faith thereof passed to the surplus and individual profits funds the sum of $18,000.

The case was submitted to a jury upon special issues, which with the answers are as follows:

"Question No. 1: Did D. L. Hill represent to the plaintiffs that the note sued upon would not be delivered to the payee until after he had inserted over their signatures the name of the Lordsburg State Bank, and words indicating that they signed it in their official capacity? Answer: Yes.

"Question No. 2: Were the renewals of the

collateral to the note sued upon by the defendant made with the consent, express or implied, of the plaintiffs?　Answer:　No.

"Question No. 3:　Did the Security Bank & Trust Company believe that D. L. Hill had authority from plaintiffs to deliver the note sued on as it then was?　Answer:　Yes."

Thereupon judgment was rendered as heretofore indicated.

### Opinion.

It is the contention of the appellant that the note in controversy is a negotiable instrument under the Negotiable Instruments Act (Laws 1919, c. 123 [Vernon's Ann. Civ. St. Supp. 1922, arts. 6001—1 to 6001—197]), of which it is the holder in due course, and as such protected against the secret defense arising out of the fraud practiced upon the appellees by Hill.　The appellees assert that the note is not a negotiable instrument, nor is the appellant a holder in due course, and therefore the defense is available as in case of simple contract.

[1] It is objected that the negotiable quality of the instrument is destroyed by the provision that the holder can declare it due at any time if for any real or imaginary cause it deems itself insecure, thereby making the date of payment uncertain, and for the further reason that the instrument requires an act in addition to the payment of money in that it requires the deposit of additional collateral at the option of the holder. In behalf of the first objection many cases have been cited wherein notes containing provisions the same or similar to the ones incorporated in the present note have been held to render the same nonnegotiable under the Negotiable Instruments Law.　The ground of these decisions is that the date of payment is thereby made uncertain, and is wholly dependant upon the will or caprice of the holder.　But in every case so holding which has been cited the note was payable upon a day fixed and certain.　In such a note it is readily apparent that a provision which gives to the holder the right to declare the same due whenever he deems himself insecure, or which gives such right upon default in furnishing additional collateral upon demand, injects the element of complete uncertainty in the maturity date, and in effect makes it dependent upon the will of the holder, and thus comes in conflict with that provision of the act which requires that an instrument to be negotiable "must be payable on demand, or at a fixed or determinable future time."　Section 1, subd. 3.

But the present note is payable upon demand, and no case has been cited wherein such a note was held to be nonnegotiable upon the ground indicated.　In such a note by its terms there is complete uncertainty as to the date it is payable, and it is wholly dependent upon the holder's will.　Provisions of the character indicated add nothing to this element of uncertainty, and the reason for the rule of decision announced in cases of notes payable at a fixed or determinable future time has no application.　The reason for the rule failing, the rule also should fail.　We have found no authority for or against this conclusion, but deem it sound and therefore hold that the note in suit is not rendered nonnegotiable upon that ground.

[2] As to the other objection, that the provision respecting the furnishing of additional collateral is fatal to its negotiability because it requires the doing of an act in addition to the payment of money, there are cases which support the appellees in their position.　Most of the cases cited are regarded as inapplicable for the reason that the clauses considered were different from those in the present note, and were clearly promises to do acts in addition to the payment of money, or else conflicted with other provisions of the act respecting negotiable quality.　A case, however, which is not distinguishable, and which supports appellees in this respect, is Holliday State Bank v. Hoffman, 85 Kan. 71, 116 Pac. 239, 35 L. R. A. (N. S.) 390, Ann. Cas. 1912D, 1.　The opinion in Continental Bank & Trust Co. v. Baker, 132 La. 544, 61 South. 575, expressed the view only of the writer, the other four judges concurring only in the result, and being of the opinion that the instrument was negotiable.　See Bonart v. Rabito, 141 La. 970, 76 South. 166.　In Lincoln National Bank v. Perry, 66 Fed. 887, 14 C. C. A. 273, the note was payable one year from January 13, 1891, and contained an agreement authorizing the holder in a certain contingency to demand further collateral, and, if not furnished, to sell the original collateral, and to apply the proceeds in payment of the paper before it became due.　It was held that this destroyed the negotiability of the instrument. The basis of this ruling was that such agreement rendered the date of payment uncertain. It does not seem to have rested upon the ground that it required the doing of an act in addition to the payment of money.　The reason for the conclusion reached in that case is not applicable here, for, as pointed out above, complete uncertainty as to the date payable is an inherent quality of a demand note.　Lincoln National Bank v. Perry illustrates the distinguishing feature of many of the cases cited by appellees in support of the view that the present note is nonnegotiable because it requires the performance of an act in addition to the payment of money.　It must be conceded, however, that this and many of the other cases cite with approval the ruling in the Holliday State Bank Case.

On the other hand the Kentucky Court of Appeals has held directly contrary to the rule announced in the Holliday State Bank Case.　Finley v. Smith, 165 Ky. 445, 177 S. W. 262, L. R. A. 1915F, 777.　Kennedy v. Brod-

erick, 216 Fed. 137, 132 C. C. A. 381, L. R. A. 1915B, 472, in effect also repudiates the doctrine of Holliday State Bank v. Hoffman. Appellees assert that the Kentucky case is inapplicable because the Negotiable Instruments Law of that state permits a note to contain an order or promise to do an act in addition to the payment of money, but from the report of the case the only material difference between the Kentucky law and the act of this state is that the Kentucky law omits from the fifth section the words "waives the benefit of any law intended for the benefit or protection of the obligor." This omission from the Kentucky law has no bearing upon the question at issue, and in our opinion the view of the Kentucky court is correct that an agreement in a promissory note to furnish additional collateral is not a promise to do an act in addition to the payment of money within the meaning of the Negotiable Instruments Act so as to render the paper nonnegotiable. The act provides:

Section 1: "An instrument to be negotiable must conform to the following requirements:

"1. It must be in writing and signed by the maker or drawer;

"2. It must contain an unconditional promise or order to pay a sum certain in money;

"3. Must be payable on demand, or at a fixed or determinable future time;

"4. Must be payable to order or to bearer; and

"5. Where the instrument is addressed to a drawee he must be named or otherwise indicated therein with reasonable certainty."

Section 5: "An instrument which contains an order or promise to do any act in addition to the payment of money is not negotiable. But the negotiable character of an instrument otherwise negotiable is not affected by a provision which:

"1. Authorizes the sale of collateral securities in case the instrument be not paid at maturity; or

"2. Authorizes a confession or judgment if the instrument be not paid at maturity; or

"3. Waives the benefit of any law intended for the advantage or protection of the obligor; or

"4. Gives the holder an election to require something to be done in lieu of payment of money.

"But nothing in this section shall validate any provision or stipulation otherwise illegal."

Section 184: "A negotiable promissory note within the meaning of this act is an unconditional promise in writing made by one person to another signed by the maker engaging to pay on demand, or at a fixed or determinable future time, a sum certain in money to order or to bearer. Where a note is drawn to the maker's own order, it is not complete until indorsed by him."

The note in question is an unconditional promise in writing by the makers engaging to pay on demand a sum certain in money to order of appellant and literally complies with the definition of a negotiable promissory note as contained in section 184. It also con-

forms to the negotiable requirements specified in section 1. And we concur in the view of the Kentucky court that the promise to do an act in addition to the payment of money within the meaning of section 5, rendering the note nonnegotiable, is such a promise that conflicts with some one or more of the essential qualities of a negotiable note as prescribed in the other sections.

In passing upon the question that court said:

"It is quite usual to pledge collateral as security for the payment of a negotiable note, and we do not think that any narrow construction of the law should be adopted that would have the effect of impairing the value of this kind of security, or that would deny to the holder the right to insist that, if the value of the collateral deposit should become impaired, the maker must strengthen it or else precipitate the maturity of the paper. This condition in the note is merely supplementary to the fixed and controlling promises, and is really nothing more than additional security for the payment of the instrument. It is not, strictly speaking, 'an order or promise to do an act in addition to the payment of money,' but is rather an order or promise to do an act that will better secure the promise to pay the money stipulated at the time fixed in the note. If this condition or promise would disturb the negotiability of commercial paper, the effect would necessarily be to lessen the value of collateral as security, because holders of paper would not be disposed to accept collateral, much of which has a fluctuating value, if they were denied the right to insist that its value should be maintained in an amount sufficient to serve the purpose for which it was accepted." Finley v. Smith, supra.

And in Hibernia Bank v. Dresser, 132 La. 532, 61 South. 561, at page 572, Judge Provosty said:

"As I see it, the only thing that the maker of the note obligates himself to do is to pay the sum of money named in the note; he is under no other obligation whatsoever. If he does that, he is free; [he has fulfilled his entire obligation in letter and in spirit. The maker is left entirely at liberty to refuse to furnish this additional security. True, if he does refuse it, his note matures; but this refusal, or consequence of a refusal, cannot, in any sense, be said to be the doing of 'an act in addition to the payment of money.' A man cannot be said to have bound himself to do something when he is left at perfect liberty to do nothing at all. The maker of this note would have 'promised to do an act in addition to the payment of money,' if, in addition to the payment of the $60,000, he had agreed to build a house or deliver a horse, or do some other thing."

Prior to the adoption of the Negotiable Instruments Law the Texas courts had held that notes were negotiable which contained agreements declared by the courts of many other jurisdictions to render them nonnegotiable. Our courts have not been strict constructionists in that respect, but have manifested a liberal tendency. We think it would

not be consistent with that liberal tendency and spirit of the Texas courts in that respect to hold that the agreement to furnish additional collateral was a promise to do an act in addition to the payment of money within the meaning of section 5 of the act. It is therefore held that the note was not rendered nonnegotiable by the provision indicated.

[3] Another objection urged against its negotiability is:

"That the amount of the obligation is indefinite and uncertain, in that the holder is authorized by the note to hold moneys and securities of the maker other than that collateral to this note, and apply the same to the payment of obligations of the maker other than the obligations of this note."

This is predicated upon those provisions of the note which in effect pledge the attached securities and authorize its sale to secure the payment of any other indebtedness upon the part of the makers. But this does not impose any additional obligation upon the makers or render their obligation in any wise uncertain. The obligation to pay other indebtedness arises not upon these provisions in the note, but out of the contract, express or implied, which created such other indebtedness. The provisions in question simply operate to hypothecate the attached securities as collateral to secure any other indebtedness, and does not impair the negotiable quality of the note.

[4] The note being regarded as negotiable, the next question is whether the appellant is a holder in due course. There is a line of authorities which hold that the payee of a note who has acquired it without any intermediate negotiation cannot be the holder thereof in due course within the meaning of the Negotiable Instruments Law. The leading cases to this effect are Herdman v. Wheeler, 1 K. B. 361, construing the English Bills of Exchange Act, and Vander Ploeg v. Van Zuuk, 135 Iowa, 350, 112 N. W. 807, 13 L. R. A. (N. S.) 490, 124 Am. St. Rep. 275, construing the Negotiable Instruments Law of Iowa. Other American decisions to the same effect are Southern, etc., v. People's Bank, 178 Ky. 80, 198 S. W. 543; Woods v. Finley, 153 N. C. 497, 69 S. E. 502; Bank v. Edwards, 243 Mo. 553, 147 S. W. 979; and possibly some others. But other decisions are to the effect that such payee may be the holder in due course under the Negotiable Instruments Law, and under certain circumstances should be so regarded. This is the holding by the courts of Alabama, Massachusetts, Pennsylvania, and Montana. In those states it has been held that a payee who without notice and for value accepts a note which had been signed in blank and intrusted to a third person, who exceeds his authority in filling up the blanks before delivery, is a holder in due course and entitled to recover. Ex parte Goldberg & Lewis, 191 Ala. 356, 67 South.

839, L. R. A. 1915F, 1157; Liberty Trust Co. v. Tilton, 217 Mass. 462, 105 N. E. 605, L. R. A. 1915B, 144; Merchants' Bank v. Smith, 59 Mont. 280, 196 Pac. 523, 15 A. L. R. 430; Johnson v. Knipe, 260 Pa. 504, 105 Atl. 705, L. R. A. 1918E, 1042. The reasoning in the last cited cases, in our opinion, is correct. We can add nothing thereto, and they are cited in support of the conclusion that appellant, under the act, is the holder in due course of the note sued upon having received and accepted the same from Hill for value, and without notice of the fraud practiced by him and of the agreement between Hill and the appellees that before delivery the additions should be made to the signatures so as to make the note the obligation of the Lordsburg State Bank.

But it is immaterial whether appellant be regarded as a holder in due course under our Negotiable Instruments Act, for it is well settled that, under the facts indicated, and in view of the negotiable character of the note, the appellant, having received the same in the ordinary course of business, for value and without notice, is protected under the doctrine of estoppel. Davis v. Gray, 61 Tex. 506; Gulf, etc., v. Love (Tex. Civ. App.) 181 S. W. 766; Lloyds Bank v. Cooke, 1 K. B. 794, 8 Ann. Cas. 182; White-Wilson-Drew Co. v. Egelhoff, 96 Ark. 105, 131 S. W. 208; Herman's Ex'r v. Gregory, 131 Ky. 819, 115 S. W. 809.

[5] Nor can the judgment of the lower court be sustained upon the theory that the note was not upon a valuable consideration, or that Hill in procuring the same acted as appellant's agent (for which reason it is bound by his acts. The note of the Lordsburg Bank of December 23 was due and appellant was unwilling to renew the same or extend further credit to the bank. In settlement of the indebtedness it was willing to accept the personal obligation of the appellees and release the excess collateral, and so indicated. Hill, the managing officer of the bank, acted upon the suggestion and tendered the note in compliance therewith which appellant accepted, surrendered the bank's note, canceled its indebtedness, and released a large amount of collateral. This certainly was a sufficient consideration to support the accommodation note which the appellees executed. Gulf, etc., v. Love, supra, and cases there cited.

[6] Nor can we accede to the contention, under the surrounding circumstances that the Gilchrist letter of February 7th, or any other fact, evidences an agency upon Hill's part for appellant in the novation of the debt. Counsel for appellant have well answered this contention as follows:

"The only practical construction that may be placed on the letter in question, so far as the question of agency is concerned, would be that construction which would be placed on a similar

fact· that probably happens every day in some bank in El Paso where a maker of a note is called upon by the bank for its payment at maturity; the officer of the bank tells him that the note must be paid, or, if the maker will obtain the signatures of certain parties as joint makers, an extension may be had; the maker of the note then goes out and procures such joint makers and returns the note to the bank. It would be an extraordinary rule if in such case it would be held that such joint makers could defend against payment of the note on the ground that in procuring their signatures the debtor committed a fraud on them, and that such fraud was attributable to the bank as principal because its officer suggested that such note with the additional signatures would be satisfactory."

The bona fides of appellant is also questioned but there is nothing in the evidence to impeach the same.

Error is assigned to the action of the court in excluding a letter written by Hill to Gilchrist, and which accompanied the series of notes and drafts aggregating $80,000, as shown by bill of exception No. 4; also the exclusion of certain testimony of Gilchrist set out in bill of exception No. 5. Under our view of the facts as disclosed by the evidence, this letter and oral evidence was merely cumulative of undisputed evidence, and the action of the court in excluding the same harmless. But, if the evidence can be construed as raising an issue respecting the bona fides of appellant, or that Hill was the agent of appellant in the transaction out of which this litigation arose, then such letter and oral testimony were material and admissible upon such issues, and its exclusion error necessitating reversal and retrial.

[7] But, upon our view of the law and undisputed evidence, the judgment should be reversed and here rendered. It appears, however, that appellant, without authority from appellees, accepted renewals of some of the collateral notes which it held. This constituted a conversion of the collateral notes so renewed, and appellees are entitled to credit for the principal and accrued interest of the notes so renewed as of the dates of renewal. Farm Invt. Co. v. College, etc., 10 Wyo. 240, 68 Pac. 561; Stevens v. Wiley, 165 Mass. 402, 43 N. E. 177; St. John v. O'Connell, 7 Port. (Ala.) 466; Paw Paw Bank v. Walker, 115 Mich. 434, 73 N. W. 378; Jones on Collateral Securities, § 719.

It is, therefore, ordered that the judgment be reversed and here rendered in appellant's favor against Foster, Austin, Edgar, Graham, Jackson, Hill, and Leahy for the sum of ·'$18,635.58, and as attorney's fees the further sum of $2,888.55; and, since Hill and Leahy did not appeal, judgment will be rendered against them for the further sum of $19,-383.32, and as attorney's fees the additional sum of $1,893.34; the principal sums so ad-

judged against said parties to bear interest at the rate provided in the note. ·

Reversed and rendered.